# UNITED STATES DISTRICT COURT

for the

Northern District of Texas

Dallas Division

FILED-USDC-NDTX-DA
'25 DEC 4 PM 12:42
KM

|  |  |
|---|---|
| Dale Lotts<br>*Plaintiff*<br><br>-v-<br><br>City of Irving,<br>Officer James Markham,<br>Officer Andrew Hammett,<br>Officer Paul Lewis,<br>John Doe Jail Officers 1–10<br>*Defendants* | Case No. 3-25 CV 3329-S<br><br>Jury Trial: Yes |

## COMPLAINT FOR A CIVIL CASE

**I.      The Parties to This Complaint**

**A.      The Plaintiff**

| | |
|---|---|
| Name | Dale Lotts |
| Street Address | 401 E 8th St |
| | Ste 214 PMB 7860 |
| City and County | Sioux Falls and Minnehaha |
| State and Zip Code | SD and 57103 |
| Telephone Number | 612-208-9601 |
| E-mail Address | dale.lotts@policeconduct.org |

| | |
|---|---|
| Mailing Address | Dale Lotts |
| (Service accepted here) | ℅ Northwest Registered Agent |
| | 5900 Balcones Drive # 19816 |
| | Austin, TX 78731 |

## B.    The Defendants

Defendant No. 1

| | |
|---|---|
| Name | City of Irving |
| Job or Title (if known) | Municipality operating the Police Department and City Jail |
| Street Address | 825 W. Irving Blvd. |
| City and County | Irving, Dallas County |
| State and Zip Code | Texas 75060 |
| Telephone Number | (972) 721-2600 |
| E-mail Address | |

Defendant No. 2

| | |
|---|---|
| Name | James Markham |
| Job or Title (if known) | Police Officer, Badge #1379 Irving Police Department |
| Street Address | 305 N. O'Connor Rd. |
| City and County | Irving, Dallas County |
| State and Zip Code | Texas 75061 |
| Telephone Number | (972) 273-1010 |
| E-mail Address | |

Defendant No. 3

| | |
|---|---|
| Name | Andrew Hammett |
| Job or Title (if known) | Police Officer, Badge #1263 Irving Police Department |
| Street Address | 305 N. O'Connor Rd. |

|  |  |
|---|---|
| City and County | Irving, Dallas County |
| State and Zip Code | Texas 75061 |
| Telephone Number | (972) 273-1010 |
| E-mail Address | |

Defendant No. 4

|  |  |
|---|---|
| Name | Paul Lewis |
| Job or Title (if known) | Police Officer, Badge #1370 |
| | Irving Police Department |
| Street Address | 305 N. O'Connor Rd. |
| City and County | Irving, Dallas County |
| State and Zip Code | Texas 75061 |
| Telephone Number | (972) 273-1010 |
| E-mail Address | |

Defendant No. 5

|  |  |
|---|---|
| Name | John Doe Jail Officers 1–10 |
| | (specific identities unknown) |
| Job or Title (if known) | Booking, detention, and supervisory |
| | staff at Irving City Jail |
| Street Address | 305 N. O'Connor Rd. |
| City and County | Irving, Dallas County |
| State and Zip Code | Texas 75061 |
| Telephone Number | (972) 273-1010 |
| E-mail Address | |

## II.   Basis for Jurisdiction

This action arises under the Constitution and laws of the United States,

including 42 U.S.C. § 1983. Plaintiff seeks redress for the violation of his

rights by officers and employees of the City of Irving.

This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343 because the claims arise under federal law and seek relief for the deprivation of constitutional rights under color of state law.

Venue is proper under 28 U.S.C. § 1391(b) because all events giving rise to the claims occurred in Irving, Texas, within the Northern District of Texas, Dallas Division.

### III.    Factual Allegations

A.    On December 4, 2023, before any interaction with officers, Plaintiff was walking alone in and around the Westgate Center Mall in Irving, Texas. Plaintiff did not enter any business or other establishment during his walk

B.    During his walk, Plaintiff passed "TCH Social," which appeared to be a bar. At the time, the patrons visible through the front windows of TCH Social appeared predominantly Black. In the parking row directly in front of TCH Social, Plaintiff observed a marked Irving police vehicle parked beside one of the only cars in that row. Plaintiff saw the officer looking into the unoccupied vehicle. Based on Plaintiff's own background and experience — including growing up

4

with a father who served as a deputy sheriff and a cousin who is a

sitting sheriff — the prolonged focus on an unoccupied parked vehicle

in an otherwise empty parking lot seemed unusual. *Plaintiff did not*

*learn what the officer was doing until later; during the body-worn*

*camera recording at approximately 1:44:21, Officer Markham stated*

*that he had run the vehicle's license plate and compared it to the VIN*

*because, according to him, "I thought it might be stolen."*

C.  Later, Plaintiff was walking toward North MacArthur Boulevard using

the available sidewalk, crossed an internal mall roadway near Chop

Sports Las Colinas, and continued along a grassy area where no

sidewalk was present.

D.  As Plaintiff approached the public sidewalk along North MacArthur,

he noticed a marked Irving police vehicle pull up and stop just behind

him. Plaintiff assumed the vehicle was stopping momentarily for the

stop sign at that location. To avoid walking in front of the vehicle,

Plaintiff paused on the sidewalk and waited for the vehicle to depart.

The vehicle did not move. Plaintiff waited for a few minutes and the

vehicle did not depart.

E.     Plaintiff then walked approximately one block along North MacArthur, crossed another mall entrance, and sat on the sidewalk to look at his phone. The patrol vehicle remained stationary and continued to observe from the same position.

F.     Believing he was being surveilled, Plaintiff raised both middle fingers toward the vehicle. The vehicle still did not move. After several minutes, Plaintiff began recording on his cellphone and walked back toward the patrol car.

G.     Plaintiff's cellphone recording does not reflect unsteady gait, slurred speech, impaired coordination, or any behavior suggesting intoxication during this approach.

H.     As Plaintiff approached the patrol vehicle, Officer Markham rolled down his window. Plaintiff asked why the officer was parked in a manner that blocked part of the driving lane and, when asked what he would do if a civilian parked the same way, Markham responded, "Probably ask them to move." Plaintiff continued questioning the officer's conduct. Immediately after this criticism, Officer Markham made a brief radio transmission (cellphone video timestamp

6

approximately 0:53), then exited his vehicle and the verbal exchange continued. *When additional officers later arrived, Plaintiff understood that the earlier transmission may have been a request for backup, though he could not hear its content at the time.*

I.  Throughout the verbal exchange, Plaintiff engaged in speech protected by the First Amendment, including criticizing Officer Markham's job performance, questioning his reason for remaining parked in a no-parking zone and obstructing the exit lane, challenging his continued presence, and objecting to his surveillance. Plaintiff at times used profanity, but remained non-violent, non-threatening, and physically compliant throughout.

J.  During the early portion of the verbal exchange, at approximately 1:41:54 on Markham's body-worn camera, Markham described in detail Plaintiff's prior movements through the Westgate Center Mall area and attributed motives to Plaintiff that Plaintiff had never expressed. Markham stated, in substance, that Plaintiff was "pissed off," that he "knew [Plaintiff] was about to jaywalk," that Plaintiff expected a ticket, and that Plaintiff "might have warrants,". Markham

also stated, "That's called proactive police work, my friend," and "It's called doing our job."

K.  Plaintiff did not know that Officer Markham had been specifically surveilling him until the patrol vehicle pulled up near the public sidewalk and remained there as Plaintiff waited for it to leave. Markham's statements on his body-worn camera lead Plaintiff to understand that Officer Markham had monitored Plaintiff's movements for a long period of time. Despite this claimed observation period, Markham did not initiate contact, conduct any welfare check, attempt to evaluate Plaintiff for intoxication, or express concern that Plaintiff posed a danger to himself or others.

L.  At approximately 1:43:00 on Officer Markham's body-worn camera, Plaintiff stated "You have no reason whatsoever to suspect that I'm about to commit a crime." Officer Markham immediately responded, "Oh, 100%. Would you like some justification? Because I can come up with it. You're coming from an area where people drink. You could be out in the roadway. And then you get PI. You might be drunk. I can justify that all damn day.". Plaintiff responded by saying "Oh yeah, I

8

know. You can talk shit all day long." expressing his awareness that officers may attempt to invent post-hoc justifications for detentions. This exchange occurred before any inquiry about alcohol use and while Plaintiff's behavior remained calm and non-threatening.

M.    Officer Markham repeatedly confirmed the non-custodial nature of the encounter, making statements to the effect of "you are free to go" or "you can leave" (Markham BWC 1:43:49, 1:45:16, 1:45:22, 1:45:24, 1:45:38). These statements confirmed the Plaintiff was under no legal seizure or detention.

N.    Officer Hammett arrived on scene at ~1:45:05 and stood behind Plaintiff. At ~1:45:44 Plaintiff comments "other than somebody bullshit profiling me[1], no [I do not have a problem]." At ~1:45:48, Officer Hammett laughs and says "How do you think you are being profiled?" Plaintiff responded with "you just got here. So you've already formed an opinion. … That's great … investigative technique."

O.    The body-worn camera shows that officers raised the possibility of

---

[1] Referring to Officer Markham's prolonged surveillance of Plaintiff.

intoxication only after Plaintiff criticized their conduct. At ~1:46:11, approximately seven and a half minutes into the interaction—without any change in Plaintiff's behavior—Officer Markham asked for the first time whether Plaintiff had been drinking. Plaintiff had not consumed alcohol or any other intoxicating substance.

P.    Moments later, at ~1:46:19, Officer Markham ordered Plaintiff to place his hands behind his back. Plaintiff raised his phone in his right hand to record Officer Markham's face and said "What's your suspicion that I have been drinking?" and remained still. Plaintiff allowed Markham to grab his right hand and move it behind his back without difficulty. Plaintiff did not resist, pull away, tense, twist, or make any movement indicating non-compliance.

Q.    While Plaintiff remained still and compliant, Officer Andrew Hammett approached from behind and forcefully shoved Plaintiff into the patrol vehicle, which was only a short distance from where Plaintiff had been standing when told he was under arrest. Officers Markham and Hammett then maintained Plaintiff in a high-leverage arm position, holding him in a painful control hold from

approximately ~1:46:30 to ~1:47:02, which is visible on the body-worn camera recording.

R. The arrest occurred immediately after Plaintiff's final request that the officer leave him alone, despite no change in Plaintiff's behavior, condition, or conduct.

S. Officer Paul Lewis arrived at approximately 1:46:44 on the body-worn camera recording. As he approached, Lewis briefly reached toward Plaintiff but, upon seeing that Plaintiff was standing still and offering no resistance, withdrew his hand. Lewis then produced a second set of handcuffs, applied it to Plaintiff's left wrist, and connected it to the cuff that Officer Markham had already placed on Plaintiff's right wrist. Because Plaintiff is morbidly obese and cannot bring his hands together behind his back without significant strain, two sets of handcuffs were used, after a brief attempt to use one set of handcuffs.

T. The shove into the patrol vehicle and the prolonged arm hold caused substantial pain and visible bruising on Plaintiff's arm, which Plaintiff photographed the following day.

11

U.   Following the use of force, Officer Hammett stated "that was completely unnecessary". Plaintiff did not pull away, twist, or otherwise resist during this time. Plaintiff was then informed that he was placed under arrest for "public intoxication."

V.   Shortly after placing Plaintiff in handcuffs, Officer Hammett said "wouldn't shut up before, now won't talk,", which Plaintiff understood to be a disparaging comment tied to Plaintiff's protected speech referring to Plaintiff's earlier verbal criticism of their conduct.

W.   After discovering that Mr Lotts has no warrants and no previous arrests, Officer Markham asked "why do you hate cops?" and then went on to ask Plaintiff "Do you want to do that [get a ride home] or do you want to go to jail for public intox[ication]?" Under Texas law, public intoxication requires not only intoxication but also that the person pose a danger to himself or others. Offering to release a person or transport them home is inconsistent with a belief that the person is so intoxicated that they pose a danger to themselves or others.

X.   During post-arrest conversation, Officer Hammett claimed Plaintiff had been "staggering," a statement contradicted by body-worn camera

footage and the Municipal Court's suppression order (See II below).

Y.    The body-worn camera recordings contain gaps in audio. The recordings do not state why audio is absent during those periods or whether the audio was intentionally disabled. Plaintiff is not aware of any explanation for these gaps, and the missing audio prevents a complete record of the officers' interactions with Plaintiff.

Z.    At no time during Plaintiff's walk through the Westgate Center Mall area, nor during the subsequent face-to-face encounter, did Plaintiff stumble, stagger, slur speech, smell of alcohol, enter a roadway, or display any behavior consistent with intoxication. Plaintiff walked normally, stood upright, and spoke clearly, as reflected in the body-worn camera recordings. At no point did Officer Markham conduct any field sobriety assessment, request coordination tests, perform a welfare check, or take any action suggesting that he believed Plaintiff was impaired or posed a danger to himself or others.

AA.    Plaintiff was transported to the Irving City Jail. At the jail, staff told Plaintiff he would not be booked or processed unless he answered their questions.

BB.   At no point did any jail officer ask Plaintiff whether he had consumed alcohol, whether he felt impaired, or whether he posed a danger to himself or others. No sobriety check, medical screening, or danger assessment was performed. The only descriptive statement made about Plaintiff during intake was Officer Markham's remark that Plaintiff was "one of those camera guys," which the jail officer accepted without further inquiry. Plaintiff showed normal speech, gait, and responsiveness and had no odor of alcohol, yet jail staff initiated standard booking procedures without evaluating whether the statutory elements of public intoxication were satisfied.

CC.   Jail staff did not ask Plaintiff any questions about alcohol use, intoxication, or danger to himself or others. Intake officers performed no sobriety screening, no medical assessment, and made no inquiry into the basis for a public-intoxication arrest. The only descriptive statement made about Plaintiff during intake was Officer Markham's comment to jail staff that Plaintiff was "one of those videotape guys," which staff acknowledged without further inquiry.

DD.   After Plaintiff invoked his Fifth Amendment right to remain silent, the

jail officer continued questioning him. The officer stated, "These are just medical questions, okay," and repeated questions despite Plaintiff's refusal to answer. This occurs on Markham's body-worn camera at approximately 2:29:15.

EE.    The same jail officer then stated, "Unfortunately, sir, if you don't answer my questions we are going to have to put you in a suicide [restraint/smock]. I won't have to do it, but these are just simple yes or no questions, okay." Plaintiff continued to remain silent after the threat.

FF.    A second jail officer approached and asked Plaintiff, "Are you going to try to hurt yourself while you're here?" Plaintiff, fearing that he would be placed in restraints or subjected to suicide protocols for an unknown amount of time, responded "no."

GG.    Plaintiff was denied access to a phone until he agreed to answer the questions and be fingerprinted. Jail staff repeatedly insisted that Plaintiff could not be booked unless he answered their questions, yet state law does not permit prolonged detention or denial of magistrate appearance based on refusal to answer non-essential questions. Denial

of timely phone access prevented Plaintiff from contacting counsel and from arranging timely release, thereby prolonging detention without legitimate justification.

HH.   Other detainees were processed and allowed to call while Plaintiff waited.

II.   Plaintiff was denied shoes, bedding, and items provided to other detainees until he answered their questions.

JJ.   After nearly 7 hours, Plaintiff believed that he would be held indefinitely unless he answered their questions, so he contacted the staff on the intercom and told them he would answer their questions. Plaintiff then waited approximately one more hour for staff to come and ask their questions.

KK.   After questioning Plaintiff, the jailer took his blood pressure, which measured above 200 systolic. Despite this measurement, Plaintiff was not evaluated by any medical professional, was not monitored, and no medical attention of any kind was provided.

LL.   Plaintiff was held past the morning magistrate docket and released

later that afternoon. Other detainees were released from their cell

before the meeting, sitting in groups and chatting while waiting, then

appeared before the magistrate and released after.

MM.  On March 7, 2025, the Irving Municipal Court granted Plaintiff's

Motion to Suppress and ordered all evidence resulting from the

detention and arrest suppressed. At the suppression hearing, Officer

Markham identified several moments on the body-worn camera

recording that he claimed showed Plaintiff slurring his speech, but the

video did not support those assertions, and the Court suppressed all

resulting evidence. Several of the officers' stated justifications for

Plaintiff's arrest were contradicted by the body-worn camera

recordings, as confirmed during the suppression hearing.

NN.  The charge was dismissed, but the arrest record continues to exist and

harms Plaintiff's employment, income, and pilots license.

## IV.    Statement of Claim

### Claim 1 - Fourth Amendment - Unlawful Arrest and False Imprisonment

Officers Markham and Hammett arrested Plaintiff without probable

cause and without any objective sign of intoxication or danger.

Plaintiff exhibited no signs of intoxication and no behavior indicating

danger to himself or others, and Officer Markham made repeated

statements that Plaintiff was 'free to go' before initiating the arrest.

These facts are inconsistent with a belief that probable cause existed

for public intoxication. In addition, during the encounter Officer

Markham told Plaintiff that he could either be driven home or taken to

jail, which is inconsistent with a belief that Plaintiff was so

intoxicated that he posed a danger to himself or others, the statutory

requirement for public-intoxication under Texas Penal Code §49.02.

Jail staff's immediate labeling of Plaintiff as "one of those videotape

guys," the continuation of questioning after he invoked his Fifth

Amendment rights, and the threats of suicide-restraint placement used

to coerce compliance demonstrate that Plaintiff's protected expressive

conduct — recording and verbally criticizing police — directly

triggered escalating adverse treatment.

**Claim 2 - First Amendment — Retaliation for Protected Speech**

18

Plaintiff's arrest occurred immediately after he questioned and criticized Markham's conduct. The timing and circumstances indicate the arrest was in retaliation for protected speech. Officers' own recorded statements, including remarks that Plaintiff "wouldn't shut up before" and mocking Plaintiff's protected criticism, further demonstrate retaliatory motive.

Plaintiff's criticism of police conduct is core political speech, fully protected by the First Amendment.

See City of Houston v. Hill, 482 U.S. 451, 462–63 (1987) ("The First Amendment protects a significant amount of verbal criticism and challenge directed at police officers.")

## Claim 3 - Fourteenth Amendment — Due Process and Deliberate Indifference

John Doe Jail Officers denied Plaintiff timely access to telephonic communication and legal counsel, delayed his magistrate presentation, used coercive booking procedures, denied medical attention despite hypertensive crisis, and subjected him to punitive conditions without

justification.

The use of suicide-restraint threats to compel Plaintiff to answer questions after he invoked his Fifth Amendment right violates clearly established Fourteenth Amendment law. Plaintiff posed no threat to himself or others, expressed no suicidal ideation, and exhibited normal behavior. The threats were retaliatory, punitive, and coercive, imposed for the purpose of extracting compliance, not for any legitimate safety purpose.

**Claim 4 - Excessive Force**

Officers Markham and Hammett used objectively unreasonable force on a completely compliant and non-resisting individual by forcefully shoving Plaintiff into a patrol vehicle and by applying a prolonged pain-compliance hold while Plaintiff was motionless and allowing himself to be handcuffed. The force used was more than de minimis, unnecessary, disproportionate, and resulted in pain and visible bruising. Officer Lewis's conduct upon arrival confirms that Plaintiff presented no resistance or threat. Officer Hammett later acknowledged on body-worn camera that the force used was "completely

unnecessary," confirming that Plaintiff was compliant. The force used caused pain and visible bruising, and was more than de minimis.

Plaintiff was fully compliant, motionless, and allowed officers to move his hands without resistance. The shove into the patrol vehicle and the prolonged pain-compliance hold occurred despite Plaintiff offering no physical threat, resistance, or evasive behavior.

The threat to place Plaintiff in suicide restraints without cause is a form of psychological force, used to compel compliance after invocation of constitutional rights.

**Claim 5 - Section 1983 Conspiracy**

Officers Markham, Hammett, and Lewis acted together throughout the encounter, including during post-arrest discussions that occurred outside the audible range of body-worn cameras. Their coordinated statements, shared responses to Plaintiff's speech, and unified justifications for the arrest support the existence of joint action to deprive Plaintiff of constitutional rights.

The coordinated treatment continued at the jail, where both Officer

Markham and jail staff referenced Plaintiff as "one of those videotape guys," evidencing shared animus and cooperative action between patrol officers and jail personnel.

### Claim 6 - Monell Liability — City of Irving

Plaintiff's constitutional injuries were caused by the policies, customs, and practices of the City of Irving. The City maintained:

- an established pattern of pretextual public-intoxication arrests by specific officers,

- coercive and unlawful jail-booking practices,

- a widespread and tolerated practice of muting body-worn-camera audio during enforcement encounters, and

- systemic failures in supervision, training, and discipline that allowed these practices to persist.

Each of these customs was a moving force behind Plaintiff's unlawful arrest, excessive force, retaliatory detention, and due-process violations.

### Pattern of Pretextual Public-Intoxication Arrests Known to

**Supervisors.**

Due to the filing deadline, Plaintiff was unable to obtain department-wide arrest data to determine the typical volume of public-intoxication arrests across all patrol officers. However, FOIA records obtained by Plaintiff show that, from 2022 through early 2024, Officer Andrew Hammett made 27 arrests for "public intoxication," while Officer Paul Lewis made 8, and Officer James Markham—who was trained by Hammett as his Field Training Officer—made 15.

Compared to Officer Lewis, a similarly situated patrol officer during the same period, both Hammett and Markham made substantially higher numbers of public-intoxication arrests. The pronounced concentration of PI arrests among Hammett and his trainee Markham, combined with Lewis's significantly lower figure, plausibly indicates a subgroup-level pattern that City supervisors would have observed through routine arrest-report reviews, shift reports, and the department's mandatory supervisory approval of arrests. Despite this clear clustering of arrests involving the same discretionary offense,

23

the City took no corrective action, demonstrating deliberate indifference to the obvious risk that officers were using public-intoxication arrests as pretextual detentions unsupported by probable cause.

This pattern aligns with Plaintiff's own experience, in which he displayed no signs of intoxication, was repeatedly told he was "free to go," and was arrested immediately after criticizing Officer Markham's conduct.

**Unlawful and Coercive Jail-Processing Practices.**

The Irving City Jail maintained a practice of requiring detainees to answer non-essential questions before booking, delaying phone access, and postponing magistrate presentation until detainees complied—all in violation of Texas law. In Plaintiff's case, jail officers refused to process him, denied him phone access, threatened restraints without cause, withheld shoes and bedding, and held him for many hours until he agreed to answer questions.

These practices were not the actions of a rogue officer; they were standard jail procedures applied consistently to Plaintiff over many

hours, in the presence of multiple staff members. This plausibly alleges a continuing operational custom for which the City is liable under Monell.The City failed to train jail staff on lawful invocation of the Fifth Amendment, the prohibition on coercive questioning, and the constitutional limits on suicide-watch placement. Instead, staff used suicide-restraint protocols as a compliance tool, evidencing systemic failures in training and supervision.

Together, these facts plausibly show a custom of using PI arrests as a discretionary tool to detain individuals without probable cause or to punish protected speech. This unconstitutional custom was a moving force behind Plaintiff's injuries.

**Threat-Based Coercive Intake Protocols**

Body-worn camera footage shows jail staff using suicide-restraint threats to coerce arrestees, including Plaintiff, into answering booking questions after invocation of Fifth Amendment rights. Jail officers continued questioning Plaintiff after he invoked his right to remain silent, stating they would "have to put [him] in a suicide [restraint/smock]" if he did not answer. A separate officer then asked

Plaintiff whether he intended to harm himself, despite Plaintiff

showing no signs of distress or suicidal behavior. These coercive

threats were delivered as part of standard intake procedure and not as

individualized safety assessments, demonstrating a jail-level custom

of compelling compliance through punitive use of suicide-watch

procedures.

**Persistent Practice of Muting Body-Worn-Camera Audio.**

Plaintiff's body-worn-camera recordings contain unexplained gaps in

audio during an enforcement encounter, and officers provided no

explanation.

 Plaintiff alleges on information and belief that this practice was

widespread and tolerated at the time of his arrest, enabling officers to

avoid transparency and accountability and facilitating retaliatory or

unjustified arrests without fear of review. Courts routinely recognize

that municipal toleration of BWC muting constitutes a plausible

unconstitutional custom at the pleading stage.

**Failure to Train, Supervise, and Discipline.**

The City failed to train officers on:

- the probable-cause requirements for public intoxication (which requires both intoxication and danger to self or others),

- the prohibition on retaliatory arrests based on protected speech,

- lawful use of force on compliant subjects,

- the legal limits of investigatory encounters, and

- mandatory jail-processing and magistrate-presentation requirements.

The City also failed to supervise or discipline officers whose arrest patterns deviated sharply from similarly situated peers, including Hammett and Markham, despite reviewing each PI arrest for approval. This supervisory inaction—combined with high PI arrest counts, use of PI to justify discretionary detentions, and the lack of any corrective response—demonstrates deliberate indifference under Connick v. Thompson and related precedent.

The City failed to train jail staff on lawful invocation of the Fifth Amendment, the prohibition on coercive questioning, and the constitutional limits on suicide-watch placement. Instead, staff used suicide-restraint protocols as a compliance tool, evidencing systemic failures in training and supervision.

**Moving Force.**

The City's customs and failures were the moving force behind Plaintiff's constitutional injuries. The arresting officers acted consistently with the identified customs—using PI as a pretext, retaliating against protected speech, applying excessive force without provocation, withholding procedural rights at booking, and selectively muting body-camera audio—all of which directly caused Plaintiff's damages.

The jail's coercive questioning, suicide-restraint threats, and unquestioning acceptance of a baseless PI arrest demonstrate that City customs predetermined Plaintiff's treatment, making these customs the direct moving force behind the violations he suffered.

## State Criminal Case Outcome

On March 7, 2025, the Irving Municipal Court granted Plaintiff's Motion to Suppress and ordered all evidence resulting from the detention and arrest suppressed. The Court issued no written findings. The criminal charge was dismissed, but the arrest record remains and continues to harm Plaintiff's employment, licensing, and background

checks.

## V.    Relief

The Plaintiff, Dale Lotts, respectfully prays for judgment against the

Defendants, jointly and severally, and requests the Court grant the

following relief:

1.    Compensatory and General Damages: An award of

compensatory damages in an amount to be determined by the

trier of fact, sufficient to compensate the Plaintiff for all injuries

suffered, including, but not limited to:

- costs incurred defending the public-intoxication charge;

- legal fees and expenses relating to expunction efforts;

- lost income;

- reputational harm;

- emotional distress;

- ongoing harm to employment, background checks, and

professional licensing (including FAA medical

requirements).

2.      Punitive damages against the individual officers for reckless or
callous disregard of Plaintiff's rights.

3.      Injunctive relief requiring correction or removal of the arrest
record.

4.      Any and all other relief, whether legal or equitable, as the Court
deems just and proper.

## VI.      Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the
best of my knowledge, information, and belief that this complaint: (1) is not
being presented for an improper purpose, such as to harass, cause
unnecessary delay, or needlessly increase the cost of litigation; (2) is
supported by existing law or by a nonfrivolous argument for extending,
modifying, or reversing existing law; (3) the factual contentions have
evidentiary support or, if specifically so identified, will likely have
evidentiary support after a reasonable opportunity for further investigation or
discovery; and (4) the complaint otherwise complies with the requirements
of Rule 11.

### A.      For Parties Without an Attorney

I agree to provide the Clerk's Office with any changes to my address where case–related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing:    December 3, 2025

Signature of Plaintiff

Printed Name of Plaintiff    Dale Lotts

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
Lotts, Dale D

## DEFENDANTS
City of Irving; Officer James Markham; Officer Andrew Hammett; Officer Paul Lewis: John Doe Jail Officers 1–10

**(b)** County of Residence of First Listed Plaintiff    Minnehaha County, SD
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant    Dallas County, TX
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

RECEIVED

DEC - 4 2025

CLERK, U.S. DISTRICT COURT

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Attorneys *(If Known)*

3-25CV3329-S

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1  U.S. Government
    Plaintiff

☒ 3  Federal Question
    *(U.S. Government Not a Party)*

☐ 2  U.S. Government
    Defendant

☐ 4  Diversity
    *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*                                    *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | Personal Injury Product Liability | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | **LABOR** | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 710 Fair Labor Standards Act | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 160 Stockholders' Suits | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 720 Labor/Management Relations | ☐ 861 HIA (1395ff) | ☐ 485 Telephone Consumer Protection Act |
| ☐ 190 Other Contract | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 740 Railway Labor Act | ☐ 862 Black Lung (923) | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | | | ☐ 751 Family and Medical Leave Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 196 Franchise | | | | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Matters |
| ☐ 210 Land Condemnation | ☒ 440 Other Civil Rights | **Habeas Corpus:** | ☐ 791 Employee Retirement Income Security Act | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 896 Arbitration |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 950 Constitutionality of State Statutes |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1  Original Proceeding
☐ 2  Removed from State Court
☐ 3  Remanded from Appellate Court
☐ 4  Reinstated or Reopened
☐ 5  Transferred from Another District *(specify)*
☐ 6  Multidistrict Litigation - Transfer
☐ 8  Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
42 U.S.C. § 1983 – Unlawful arrest, retaliation, excessive force, due process violations, Monell liability
Brief description of cause:
Unlawful arrest, retaliation, excessive force, due process violations, Monell liability

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.
DEMAND $
Monetary damages and injunctive relief
CHECK YES only if demanded in complaint:
JURY DEMAND:  ☒ Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*
JUDGE _____    DOCKET NUMBER _____

DATE    December 3, 2025
SIGNATURE OF ATTORNEY OF RECORD    *Dale Lotts*

FOR OFFICE USE ONLY