## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **DALE LOTTS** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | **CIVIL ACTION NO.** |
| | § | **3:25-CV-03329-S-BN** |
| **VS.** | § | |
| | § | |
| **CITY OF IRVING, OFFICER JAMES** | § | |
| **MARKHAM, OFFICER ANDREW** | § | |
| **HAMMETT, OFFICER PAUL LEWIS,** | § | |
| **and JOHN DOE JAIL OFFICERS 1-10** | § | |
| | § | |
| **Defendants.** | § | |

## PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT CITY OF IRVING'S RULE 12(b)(6) MOTION TO DISMISS

---

**Use of Generative Artificial Intelligence.** Pursuant to N.D. Tex. L. Civ. R. 7.2(f), Plaintiff discloses that generative artificial intelligence was used to assist in research, organization, and drafting of this response. Plaintiff reviewed and edited the final text and independently verified all legal authorities cited herein. Plaintiff takes full responsibility for the content and accuracy of this filing.

# TABLE OF CONTENTS

Table of Contents.................................................................................................................2

**INTRODUCTION**..............................................................................................................1

**STATEMENT OF FACTS**................................................................................................. 3

**ARGUMENT AND AUTHORITIES**....................................................................................5

    The Governing Standard................................................................................................ 5

    A. The Predicate Constitutional Violations Are Plausibly Pled................................... 6

    B. The Complaint Adequately Alleges an Official Custom or Policy............................7

        1. The Pattern of Pretextual PI Arrests..............................................................7

        2. The "Videotape Guys" Informal Custom..........................................................9

        3. BWC Muting as Tolerated Practice................................................................ 11

        4. Jail Customs Independently Support Monell Liability.....................................12

    C. Three Independent Paths Establish Deliberate Indifference.................................13

        Path 1: Actual Notice — The Suppression Order..........................................14

        Path 2: Constructive Notice — The Pattern..................................................15

        Path 3: Obviousness — No Pattern Required................................................ 16

    D. The Complaint States a Plausible Failure-to-Train Claim................................... 18

    E. The Complaint States a Plausible Failure-to-Supervise Claim..........................24

    F. Exemplary Damages Are Conceded as to the City..........................................26

**CONCLUSION**................................................................................................................ 26

**CERTIFICATE OF SERVICE**.......................................................................................... 27

# TABLE OF AUTHORITIES

**Cases**

| Case | Page(s) |
| --- | --- |
| *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) | 3, 5 |
| *Beck v. Ohio*, 379 U.S. 89 (1964) | 22 |
| *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) | 5 |
| *Brown v. Tarrant County*, 985 F.3d 489 (5th Cir. 2021) | 6 |

| | |
|---|---|
| *Bryant v. Ditech Fin., L.L.C.*, No. 23-10416, 2024 WL 890122 (5th Cir. 2024) | 5 |
| *Burge v. St. Tammany Parish*, 336 F.3d 363 (5th Cir. 2003) | 12, 24, 25 |
| *Causey v. Sewell Cadillac-Chevrolet, Inc.*, 394 F.2d 285, 287 (5th Cir. 1968) | 6 |
| *City of Canton v. Harris*, 489 U.S. 378 (1989) | 12,14, 16, 17, 18, 22, 23 |
| *City of Houston v. Hill*, 482 U.S. 451 (1987) | 16,19 |
| *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247 (1981) | 26 |
| *Connick v. Thompson*, 563 U.S. 51 (2011) | 14, 16 |
| *Estate of Davis v. City of N. Richland Hills*, 406 F.3d 375 (5th Cir. 2005) | 18 |
| *Heck v. Humphrey*, 512 U.S. 477 (1994) | 1, 8, 15, 17 |
| *Hicks v. Stahl*, No. 3:11-CV-2703-P (N.D. Tex. 2012) | 15 |
| *Hutcheson v. Dallas County*, 994 F.3d 477 (5th Cir. 2021) | 6, 7 |
| *Johnson v. City of Shelby*, 574 U.S. 10 (2014) | 15 |
| *Leatherman v. Tarrant Cnty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163 (1993) | 6 |
| *Lewis v. City of New Orleans*, 415 U.S. 130 (1974) | 19 |
| *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978) | 6, 7, 22, 24 |
| *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964) | 19 |
| *Nieves v. Bartlett*, 587 U.S. 391 (2019) | 21, 22 |
| *Owen v. City of Independence*, 445 U.S. 622 (1980) | 3 |

| | |
|---|---|
| *Pennsylvania v. Muniz*, 496 U.S. 582 (1990) | 12, 20 |
| *Peterson v. City of Fort Worth*, 588 F.3d 838 (5th Cir. 2009) | 8 |
| *Pineda v. City of Houston*, 291 F.3d 325 (5th Cir. 2002) | 8 |
| *Piotrowski v. City of Houston*, 237 F.3d 567 (5th Cir. 2001) | 6, 7, 8, 24 |
| *Turner v. Driver*, 848 F.3d 678 (5th Cir. 2017) | 16, 19 |
| *Webster v. City of Houston*, 735 F.2d 838 (5th Cir. 1984) | 7, 11 |
| *Young v. City of Irving*, No. 3:23-CV-1423-D, 2024 WL 4193936 (N.D. Tex. 2024) | 8, 20 |
| *Zarnow v. City of Wichita Falls*, 614 F.3d 161 (5th Cir. 2010) | 18 |

**Statutes and Rules**

| Authority | Page(s) |
|---|---|
| 42 U.S.C. § 1983 | 1, 9, 15, 17, 18, 20, 26, 27 |
| U.S. Const. amend. I | 6, 20, 21 |
| U.S. Const. amend. IV | 6, 17, 21 |
| U.S. Const. amend. V | 3, 13, 17, 20 |
| Fed. R. Civ. P. 12(b)(6) | 1, 5, 6 |
| Fed. R. Civ. P. 15(a)(2) | 27 |
| Tex. Penal Code § 49.02(a) | 19 |

# INTRODUCTION

The Complaint alleges a municipal system that predictably shields unconstitutional public-intoxication arrests from meaningful review. Public intoxication is a Class C misdemeanor punishable only by fine. That low-stakes charge makes challenges economically irrational for most people: many pay and plead, and a guilty plea can trigger *Heck v. Humphrey*, 512 U.S. 477 (1994), foreclosing § 1983 relief. The predictable result is fewer contested cases, less discovery, and reduced accountability—unless the City affirmatively trains, supervises, and disciplines against retaliatory enforcement.

Public intoxication is especially susceptible to misuse because its predicates are largely subjective. The elements—"intoxication" and "endangerment"—often turn on officer characterization rather than objective measurement. The Complaint alleges that is exactly how the charge functions here: a convenient pretext when protected criticism or recording escalates an encounter. Plaintiff pleads the statutory predicates were absent—no slurred speech, stumbling, staggering, or other intoxication indicators—yet officers proceeded anyway. (Compl.    Z). Those allegations support municipal causation, not merely individual fault.

The Complaint further alleges the system does not stop at the street. The same City Attorney's Office that prosecutes municipal cases also defends the City in § 1983 litigation arising from those arrests, enabling a unified "front-end / back-end" insulation mechanism. After Plaintiff prevailed on suppression, the City allegedly dismissed

without prejudice and then refused to consent to expunction, ensuring the arrest record persisted and continued harming Plaintiff's employment, income, and pilot's license. (Compl.    NN). When a civil case is filed anyway, the alleged final layer is a Rule 12 motion to dismiss.

These are not pleaded as abstractions. The Complaint alleges quantified arrest concentration among a small subgroup: from 2022 through early 2024, Officer Hammett made 27 public intoxication arrests; Officer Markham—whom Hammett trained as his Field Training Officer—made 15; and Officer Lewis made 8. (Compl. at 22–23). The concentration, coupled with the FTO relationship allegedly transmitting the practice, plausibly supports a subgroup-level custom with the force of law.

The Complaint also pleads continuity at the jail. Plaintiff alleges jail staff accepted a "PI" booking without observing a single sign of intoxication (Compl.    BB); that Markham characterized Plaintiff to jail staff as "one of those videotape guys" (Compl.    CC); and that, over seven hours, multiple jail officers allegedly denied booking, phone access, shoes, and bedding unless Plaintiff waived his Fifth Amendment right to remain silent—while threatening suicide restraints for invoking that right. (Compl. ¶¶ AA–JJ, EE). Plaintiff further alleges a hypertensive crisis and no medical professional was called. (Compl.    KK).

This response shows the City's motion fails on the merits. The predicate constitutional violations are addressed in Plaintiff's concurrently filed response to the officers' motion and incorporated by reference. The Complaint plausibly pleads policy/custom and deliberate indifference through multiple pathways (actual notice, constructive notice,

and obviousness), and pleads operative facts supporting failure-to-train/supervise/discipline beyond conclusory labels. And because municipalities cannot assert qualified immunity, *Owen v. City of Independence*, 445 U.S. 622 (1980), the City must meet the claims on the merits. It cannot at Rule 12.

## STATEMENT OF FACTS

The following facts are drawn from the operative Complaint and must be accepted as true at this stage. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Plaintiff incorporates the allegations summarized in his concurrently filed response to the officers' motion to dismiss and highlights below the facts most relevant to municipal liability.

**The Encounter, Arrest, and Use of Force.** On December 4, 2023, Plaintiff was walking alone near the Westgate Center Mall in Irving, Texas. (Compl.    A). The Complaint alleges Officer Markham conducted covert surveillance and then shifted to overt positioning by pulling his patrol vehicle behind Plaintiff while Plaintiff stood on a public sidewalk. (Compl. ¶¶ B–E, K). Despite covert observation, Markham allegedly did not conduct a welfare check. (Compl.    K). Plaintiff began recording and criticized Markham's conduct; Markham radioed for backup only after hearing the criticism. (Compl. ¶¶ F, H–I).

When Plaintiff stated there was no reason to suspect crime, Markham allegedly responded: "Oh, 100%. Would you like some justification? Because I can come up with it… I can justify that all damn day." (Compl.    L). Markham allegedly told Plaintiff he was "free to go" five times, then arrested him **41 seconds** after the last such statement, with

no intervening change in Plaintiff's behavior. (Compl. ¶¶ M, R). The Complaint alleges Plaintiff did not resist and placed his left hand behind his back voluntarily. (Compl.    P). Officer Hammett allegedly shoved Plaintiff into the patrol vehicle from behind and officers maintained a painful control hold for approximately 32 seconds on a compliant subject. (Compl.    Q). Hammett then allegedly admitted the force was "completely unnecessary." (Compl.    U).

**Post-Arrest Discretion and Speech-Linked Statements.** After the arrest, Hammett allegedly stated: "wouldn't shut up before, now won't talk." (Compl.    V). Markham allegedly described the deferential attitude that would have avoided jail—"you got me, it's cool, can you just gimme a ride"—and presented an ultimatum: ride home or jail. (Compl.    W). When Plaintiff continued to criticize, Markham allegedly chose jail. (Compl.    W). The Complaint pleads these post-arrest statements and choices as evidence that discretion was exercised in response to Plaintiff's speech and recording activity. (Compl. ¶¶ V–W).

At the jail, Markham allegedly described that Plaintiff was "one of those videotape guys." (Compl.    CC). The Complaint alleges jail staff accepted the "PI" booking without observing signs of intoxication. (Compl. ¶¶ BB–CC).

**The Jail Detention.** The Complaint alleges that over approximately seven hours, multiple jail officers denied Plaintiff booking, phone access, and basic necessities unless he answered questions, despite his invocation of the Fifth Amendment. (Compl. ¶¶ AA, DD, GG, II, JJ). A jail officer allegedly threatened suicide restraints to coerce compliance. (Compl.    EE). Other detainees were processed normally while Plaintiff

waited. (Compl.    HH). After Plaintiff's blood pressure was measured above 200 systolic, no medical professional was called. (Compl.    KK). Plaintiff was held past the morning magistrate docket and released later that afternoon. (Compl.    LL).

**The Alleged Pattern and Transmission.** The Complaint alleges FOIA records showing that from 2022 through early 2024, Hammett made 27 public-intoxication arrests; Markham—whom Hammett trained as his Field Training Officer—made 15; and Lewis made 8. (Compl. at 22–23). The Complaint further alleges unexplained gaps in Markham's body-worn camera audio. (Compl.    Y).

**The Suppression Order and Disposition.** The Complaint alleges that on March 7, 2025, the Irving Municipal Court granted Plaintiff's motion to suppress and ordered all evidence suppressed after concluding the recording did not support Markham's asserted indicators. (Compl.    MM). The charge was dismissed. (Compl.    NN).

## ARGUMENT AND AUTHORITIES

### The Governing Standard

At Rule 12(b)(6), the Court "must accept all well-pleaded facts as true and view them in the light most favorable to the plaintiff." A complaint must state a claim "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. at 678 (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. at 570). Critically, "just as plaintiffs cannot state a claim using speculation, defendants cannot defeat plausible inferences using speculation." *Bryant v. Ditech Fin., L.L.C.*, No. 23-10416, 2024 WL 890122, at *3 (5th Cir. 2024). Pro se complaints are

construed liberally. *Brown v. Tarrant County*, 985 F.3d 489, 494 (5th Cir. 2021). And there is "no heightened pleading standard" for Monell claims. *Hutcheson v. Dallas County*, 994 F.3d 477, 482 (5th Cir. 2021); *Leatherman v. Tarrant Cnty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 168 (1993).

To establish municipal liability under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), a plaintiff must show: (1) a predicate constitutional violation; (2) an official policy or custom; and (3) a causal connection — the policy or custom was the "moving force" behind the violation. *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001). Three pathways satisfy the policy-or-custom element: (a) an official policy, (b) a widespread custom or practice, or (c) a failure to train or supervise amounting to deliberate indifference. *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001).

## A. The Predicate Constitutional Violations Are Plausibly Pled

The City's Argument A seeks dismissal by arguing that the underlying constitutional claims fail. This argument rises or falls with the officers' motion. It fails.

Plaintiff incorporates by reference the arguments and authorities set forth in Plaintiff's Response in Opposition to the Individual Officer Defendants' Rule 12(b)(6) Motion to Dismiss, filed concurrently herewith. *See Causey v. Sewell Cadillac-Chevrolet, Inc.*, 394 F.2d 285, 287 (5th Cir. 1968) (incorporation by reference of concurrently filed documents). That Response establishes in detail that the predicate constitutional violations — First Amendment retaliation, Fourth Amendment false arrest, Fourth Amendment excessive force, and § 1983 conspiracy — are plausibly pled.

Three facts suffice for Monell purposes. *First*, Officer Markham admitted he had "100%" no basis for suspicion and would need to "come up with" justification. (Compl.    L). *Second*, Officer Hammett admitted the force used on a compliant Plaintiff was "completely unnecessary." (Compl.    U). *Third*, the Irving Municipal Court granted Plaintiff's Motion to Suppress and ordered all evidence suppressed after finding the recording did not support the officers' claims. (Compl.    MM). These three independently establish plausible predicate violations. The City cannot import the officers' qualified immunity arguments to shield itself. Municipalities have no qualified immunity defense. *Hutcheson v. Dallas County*, 994 F.3d at 482.

The Court should deny the City's Motion as to Argument A.

## B. The Complaint Adequately Alleges an Official Custom or Policy

The City argues Plaintiff has identified no City Council action constituting "official policy." This conflates two distinct Monell pathways. Custom-or-practice liability does not require formal legislative action. A custom is a practice "so common and well-settled as to constitute a custom that fairly represents municipal policy." *Webster v. City of Houston*, 735 F.2d 838, 841 (5th Cir. 1984); *Piotrowski v. City of Houston*, 237 F.3d at 578. The Complaint identifies four independent customs, any one of which suffices.

### 1. The Pattern of Pretextual PI Arrests

The Complaint pleads a quantified pattern: from 2022 through early 2024, Hammett made 27 public-intoxication arrests; Markham—whom Hammett trained as his Field Training Officer—made 15; and Lewis made 8. (Compl. at 22–23). Those are not

conclusory "pattern" labels; they are concrete counts tied to identified officers over a defined period, and they plausibly support an inference of a subgroup-level custom transmitted through the City's FTO training mechanism.

**Statistical allegations may support a custom at the pleading stage.** See *Piotrowski*, 237 F.3d at 578 (custom shown by a "pattern of similar incidents" or a practice "so common and well-settled as to constitute a custom"). The City's reliance on *Peterson* and *Pineda* is misplaced because those are summary-judgment decisions after discovery; they do not impose a heightened "numerosity" requirement at Rule 12. At this stage, the question is plausibility, and the pleaded counts and FTO relationship make a custom plausible.

**This is also unlike *Young v. City of Irving***, where the Monell claim failed for lack of identified similar incidents and operative facts. Here, Plaintiff pleads specific officers, quantified arrest counts, an FTO relationship connecting the actors, and a suppression ruling alleged to have provided notice. (Compl. at 22–23; Compl.    MM). Those allegations supply the factual grounding *Young* found missing.

**The City may argue that few citizens sue**, but public-intoxication enforcement has structural features that plausibly explain under-litigation: it is a Class C fine-only offense; many people plead to end it; and a guilty plea can trigger *Heck v. Humphrey*, 512 U.S. 477 (1994), foreclosing § 1983 relief. Those barriers make it plausible that a custom could persist with limited judicial scrutiny—particularly where the elements are often proved through officer characterization rather than objective testing.

**Plaintiff is entitled to discovery** because the full scope of the

practice—department-wide arrest data, dispositions, complaints, discipline, and

training/supervision records—is in the City's exclusive possession. The FOIA-derived

counts pleaded in the Complaint are sufficient to cross the plausibility threshold and

justify discovery into whether the City's policies, training, supervision, or discipline were

the moving force behind the constitutional violations alleged here.

## 2. The "Videotape Guys" Informal Custom

The context of Markham's statement reveals its significance. At the jail, Bermudez[1]

asked the standard intake question: "what's wrong with him?" (Compl.    CC).

Three features of this exchange compel the inference that "videotape guys" is a

pre-existing operational classification, not a passing remark.

*First*, the phrase "one of *those*." The demonstrative presupposes a known category — a

type the listener already recognizes. No one says "one of those" about something the

listener has never encountered. Markham did not explain what a "videotape guy" is. He

did not need to. (Compl.    CC).

*Second*, Bermudez's response. Staff "acknowledged without further inquiry." (Compl.

CC). No follow-up. No confusion. No request for clarification. The classification was

immediately understood — across departmental lines, from patrol to jail. This is direct

---

[1] The Complaint identifies this individual as a John Doe jail officer (Compl.    CC). The Complaint alleges that Markham said he's "one of those videotape guys." (Compl.    CC). Those pleaded facts support the inference that the arrest and subsequent treatment were linked to Plaintiff's recording activity rather than any intoxication-related condition.

evidence that the category existed in shared operational knowledge before Plaintiff's arrest.

*Third*, the exchange occurred out of Plaintiff's hearing. (Compl. CC). Markham was not performing for Plaintiff, not attempting to intimidate, not being sarcastic in the heat of the moment. This was officer-to-officer communication when the subject could not hear. People are most candid when they believe the audience is friendly and they know the subject is absent. Markham told a colleague what he actually believed the situation to be — and it was not intoxication.

The classification triggered what followed. Immediately after being labeled a "videotape guy," Plaintiff was subjected to seven hours of denied booking, phone access, and basic necessities. (Compl. ¶¶ AA-JJ). Other detainees were processed normally. (Compl. HH). The reasonable inference — which the Court must draw in Plaintiff's favor — is that the classification triggered the differential treatment.

Whether Plaintiff was actually a "First Amendment auditor" is irrelevant — and makes the inference stronger. Plaintiff was not auditing anyone. He was walking, was surveilled, and recorded the encounter. (Compl. ¶¶ A-F). Markham slotted him into "videotape guys" because that is how the department processes people who record police — regardless of the individual's actual intent. The misidentification proves the classification system exists independent of any particular person.

This custom spans departments. It was not one officer's isolated remark. It was a shared operational understanding between patrol and jail staff — precisely the kind of

"persistent, widespread practice" that constitutes a custom under *Webster v. City of Houston*, 735 F.2d at 841.

### 3. BWC Muting as Tolerated Practice

The Complaint alleges that officers' body-worn camera recordings contained unexplained gaps in audio during the encounter and its aftermath. (Compl.    Y). The Complaint further alleges that the recordings provide no explanation for the missing audio and that officers offered no contemporaneous explanation for why audio was absent. (Compl.    Y).

At the pleading stage, those allegations support a reasonable inference that disabling or losing audio during critical moments is not an accident unique to this incident, but a tolerated practice that reduces accountability and predictably impairs after-the-fact review of seizure decisions, use of force, and retaliatory motive. Plaintiff alleges on information and belief that this practice is widespread and tolerated, enabling officers to avoid accountability. (Compl. at 26).

This alleged practice is independently relevant to Monell liability in two ways. First, it constitutes a plausible custom: a repeated operational practice that affects how arrests and force are reviewed and disciplined. Second, it supports Plaintiff's failure-to-supervise theory because a municipality that meaningfully supervises constitutional policing does not tolerate unexplained audio gaps in recordings designed for accountability. At Rule 12, Plaintiff's allegations plausibly plead a municipal custom and deliberate indifference that discovery can test.

**4. Jail Customs Independently Support Monell Liability**

The jail intake practices alleged in the Complaint are not isolated acts by rogue officers. They are institutional procedures applied consistently to Plaintiff over seven hours, by multiple staff members, across shifts. (Compl. ¶¶ AA-LL). This constitutes a separate and independent basis for Monell liability — one that does not depend on the PI arrest pattern.

**The *City of Canton v. Harris* single-incident exception applies.** *City of Canton v. Harris*, 489 U.S. 378, 390 (1989), recognized that some policies are "so obviously" deficient that a single incident suffices to establish liability. The Fifth Circuit has applied this exception in the jail context. *See Burge v. St. Tammany Parish*, 336 F.3d at 370-71 (recognizing municipal liability for institutional practices). Jail intake procedures are institutional by nature — they govern a City-run detention facility and apply to every detainee. When those procedures are facially unconstitutional, no prior pattern of litigation is required.

**The practices are facially unconstitutional.** Conditioning booking on waiver of Fifth Amendment rights is facially unconstitutional. (Compl. ¶¶ AA, DD, GG, JJ). The Fifth Amendment right to remain silent is absolute; jail staff cannot withhold basic processing as punishment for exercising it. Threatening suicide restraints to coerce compliance with questioning — when the detainee exhibits no suicidal ideation or distress — is facially unconstitutional. (Compl. ¶¶ EE, FF). Denying medical evaluation when a detainee's blood pressure exceeds 200 systolic — hypertensive crisis, stroke-level risk — is obviously inadequate. (Compl.   KK). *See Pennsylvania v. Muniz*, 496 U.S. 582, 601

(1990) (routine booking questions limited to biographical data; questions beyond that require Miranda protections).

**The practices were applied as institutional custom.** Multiple officers, over seven hours, applied the same procedures. (Compl. ¶¶ AA-JJ). Other detainees were processed normally while Plaintiff waited. (Compl.   HH). This differential treatment — applied specifically after Plaintiff was classified as a "videotape guy" — demonstrates that the coercive practices were not ad hoc decisions but operational customs triggered by the classification.

**Jail procedures are attributable to the municipality.** Booking protocols, medical screening procedures, and conditions of confinement are institutional policies of the City's detention facility. The City cannot disclaim responsibility for the systematic practices of its own jail.

The Court should deny the City's Motion as to Argument B. At minimum, Plaintiff is entitled to discovery on the full scope of these customs before dismissal. Accepting these allegations as true and drawing all reasonable inferences in Plaintiff's favor, as the Court must at this stage, the Complaint plausibly alleges an official custom or policy attributable to the City.

## C. Three Independent Paths Establish Deliberate Indifference

The City argues that Plaintiff has not alleged policymaker awareness of the risk. Three independent paths establish deliberate indifference, any one of which suffices.

**Deliberate indifference standard.** Deliberate indifference requires awareness of a risk — actual or constructive — and failure to act despite obvious consequences. *Connick v. Thompson*, 563 U.S. 51, 61-62 (2011); *City of Canton*, 489 U.S. at 390. Critically, "obviousness" can substitute for a prior pattern. *Connick v. Thompson*, 563 U.S. at 64. And at Rule 12, the Court draws all reasonable inferences in Plaintiff's favor.

**Path 1: Actual Notice — The Suppression Order**

On March 7, 2025, the Irving Municipal Court granted Plaintiff's Motion to Suppress and ordered all evidence resulting from the detention and arrest suppressed. (Compl. MM). The court found the body-worn camera recording did not support the officers' claims of intoxication. (Compl. MM). This judicial determination that one of the City's officers arrested a citizen without probable cause constitutes actual notice to the City that its officers were making unconstitutional arrests.

The City Attorney's Office did not merely "become aware" of the suppression order — its own Municipal Court Prosecution division litigated the suppression hearing and lost. The municipal court reviewed the evidence presented by the prosecution and the arresting officer's asserted bases for probable cause, then suppressed all evidence after finding the asserted intoxication indicators were not supported by the body-worn camera recording. (Compl. MM). The City then dismissed the charge without prejudice and refused to consent to expunction, ensuring the arrest record continues to harm Plaintiff. (Compl. NN). The same City Attorney's Office that lost the suppression hearing now defends those same officers with claims of qualified immunity — asserting that the

arrest it failed to justify in its own municipal court was nonetheless objectively reasonable under the Fourth Amendment.

At the pleading stage, those allegations support a plausible inference of ratification and deliberate indifference: a neutral judicial officer determined the arrest lacked a lawful evidentiary basis, yet the City took no corrective action (investigation, discipline, training, or policy change) and instead chose litigation positions that defend the same conduct. (Compl. at 26–27). Plaintiff need not use the word "ratification" to plead ratification; he must plead facts from which the theory is plausible. *Johnson v. City of Shelby*, 574 U.S. 10, 11 (2014).

**The City's notice extends back over a decade.** This is not the first time the City of Irving has faced § 1983 claims arising from IPD officer conduct. In *Hicks v. Stahl*, No. 3:11-CV-2703-P (N.D. Tex. 2012), seven IPD officers were sued for forced entry into a residence, warrantless search, fabricated warrants, and excessive detention — including a sergeant who arrived in a ski mask while palming his holstered weapon. The City's response was not to investigate or retrain. It was to invoke the *Heck v. Humphrey* bar — Hicks had been convicted on evidence obtained during the challenged search — and then seek sanctions against the pro se plaintiff. The *Heck* dismissal addressed the procedural bar, not the merits of the officers' conduct. These dismissals provided notice that its officers were the subject of recurring § 1983 claims alleging similar categories of misconduct.

**Path 2: Constructive Notice — The Pattern**

The Complaint alleges that City supervisors review and approve all arrests through mandatory procedures. (Compl. at 23). The pronounced concentration of PI arrests — Hammett 27, Markham 15, Lewis 8 — was visible through routine arrest-report reviews, shift reports, and mandatory supervisory approval. (Compl. at 23). "Despite this clear clustering of arrests involving the same discretionary offense, the City took no corrective action." (Compl. at 23-24).

A pattern "so obvious" that supervisors should have known constitutes constructive notice. *Connick v. Thompson*, 563 U.S. at 64. The 3x-5x differential between Hammett/Markham and their peers is the kind of pronounced outlier pattern that routine supervisory review would have revealed. The City's failure to investigate or correct this pattern — despite having the data in its own records — demonstrates deliberate indifference.

**Path 3: Obviousness — No Pattern Required**

Even without actual or constructive notice, deliberate indifference can be established through the "obviousness" of the constitutional violation. *Connick v. Thompson*, 563 U.S. at 64; *City of Canton v. Harris*, 489 U.S. at 390 n.10. Retaliating against citizens for exercising First Amendment rights is obviously unconstitutional. *Turner v. Driver*, 848 F.3d 678, 685-86 (5th Cir. 2017) (recognizing First Amendment right to record police); *City of Houston v. Hill*, 482 U.S. 451, 462-63 (1987) (verbal criticism of police is protected). Coercing Fifth Amendment waivers at jail intake is obviously unconstitutional. Denying medical evaluation for a blood pressure reading exceeding 200 systolic is obviously inadequate.

These are not close calls. They are the kinds of violations for which "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent." *City of Canton v. Harris*, 489 U.S. at 390.

**The absence of prior litigation.** The City may argue it had no notice because no prior litigation challenged the practice. But structural barriers explain the absence of prior challenges. At the front end, public intoxication arrests are economically prohibitive to challenge — a Class C misdemeanor punishable only by fine. Most citizens pay the fine rather than challenge the charge, and most comply, and a guilty plea activates the *Heck v. Humphrey*, 512 U.S. 477 (1994), bar — permanently foreclosing any § 1983 claim. At the back end, even when a citizen challenges the charge and prevails — as Plaintiff did — the City Attorney's Office dismisses without prejudice and resists expunction, ensuring the arrest record persists as ongoing punishment. The City Attorney's Office houses both the Municipal Court Prosecution division and the Litigation & Employment division, giving the same office authority over both prosecution decisions and defense of resulting § 1983 claims. No lawsuit is filed because either the Heck bar forecloses it or the continued record harm deters it. The structural barriers to litigation — the minor classification of PI, the *Heck* bar after a plea, and the economics of § 1983 representation — explain why prior challenges are rare and why the absence of prior litigation does not negate the alleged custom. At some point, the failure to create alternative mechanisms for learning — mandatory objective evidence before PI arrest, supervisor review of PI arrest quality, audit of PI disposition rates — constitutes

deliberate indifference. The City's failure to create alternative review mechanisms supports an inference of deliberate indifference.

The Court should deny the City's Motion as to Argument C. Accepting these allegations as true and drawing all reasonable inferences in Plaintiff's favor, as the Court must at this stage, deliberate indifference is plausibly established through any one of the three independent paths identified above.

## D. The Complaint States a Plausible Failure-to-Train Claim

The City argues that its compliance with TCOLE training requirements defeats the failure-to-train claim. This argument fails as a matter of law.

**Legal standard.** Failure-to-train liability arises when "the failure to train amounts to deliberate indifference to the rights of persons with whom the [officers] come into contact." *City of Canton v. Harris*, 489 U.S. at 388. A plaintiff must identify a "specific training deficiency" and show it caused the constitutional violation. *Estate of Davis v. City of N. Richland Hills*, 406 F.3d 375, 383 (5th Cir. 2005).

**TCOLE compliance does not establish adequate training.** The Fifth Circuit considers compliance with state-mandated training requirements as one factor in the analysis, not a complete defense. *Zarnow v. City of Wichita Falls*, 614 F.3d 161, 170 (5th Cir. 2010). But TCOLE sets a floor — minimum standards that apply to every department in the state regardless of size, demographics, or constitutional exposure. The relevant question is whether the City provided training adequate to the specific constitutional tasks its officers perform. *City of Canton v. Harris*, 489 U.S. at 390. When

officers repeatedly commit the same category of constitutional violation despite TCOLE compliance, that compliance proves the floor is too low for the task — not that the City met its obligations.

**Five specific training deficiencies.** Plaintiff identifies five specific gaps in TCOLE training that caused the violations at issue:

*First*, PI "danger" element. TCOLE does not train officers on evaluating whether an individual poses a "danger to himself or another" under Texas Penal Code § 49.02(a). The result: Markham offered Plaintiff a ride home — an option no officer would extend to someone he believed posed a danger to himself or others — yet arrested him for PI anyway. (Compl.    W). The training gap directly caused the unlawful arrest.

*Second*, First Amendment retaliation. TCOLE does not train officers on the prohibition against retaliatory arrests for protected speech, including under *Turner v. Driver* (right to record police) and *City of Houston v. Hill* (right to verbally criticize). The First Amendment protects "'vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials.'" *City of Houston v. Hill*, 482 U.S. at 461 (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964)). "[A] properly trained officer may reasonably be expected to 'exercise a higher degree of restraint' than the average citizen." *City of Houston v. Hill*, 482 U.S. at 462 (quoting *Lewis v. City of New Orleans*, 415 U.S. 130, 135 (1974) (Powell, J., concurring)). Yet here, criticism produced arrest. The result: Markham arrested Plaintiff immediately after criticism, told jail staff he was "one of those videotape guys" when asked what was wrong with him, and Hammett stated "wouldn't shut up before, now won't talk." (Compl. ¶¶ CC, V, O). Officers who

understood First Amendment protections would not have connected the arrest to speech in their own words.

*Third*, body-worn camera muting protocols. TCOLE does not mandate training on when muting body-worn camera audio is or is not permissible, or on Texas statutory requirements to document reasons for non-activation. The result: unexplained audio gaps during the critical post-arrest period. (Compl.    Y).

*Fourth*, jail intake Fifth Amendment. TCOLE does not train jailers to respect Fifth Amendment invocations during booking. The result: multiple officers over seven hours denied booking, phone access, and basic necessities to coerce Plaintiff into answering questions after he invoked his right to remain silent. (Compl. ¶¶ AA, DD, GG, JJ). A jail officer threatened suicide restraints. (Compl.    EE). *See Muniz*, 496 U.S. at 601 (routine booking questions limited to biographical data).

*Fifth*, body-worn camera documentation requirements. TCOLE does not address Texas statutory requirements that officers document reasons for not activating body-worn cameras. The result: unexplained audio gaps without documentation. (Compl.    Y).

**The officers know how to investigate intoxication — when they want to.** In *Young v. City of Irving*, No. 3:23-CV-1423-D, 2024 WL 4193936, at *3 (N.D. Tex. Sept. 12, 2024), Irving officers investigating a suspected DWI transported the suspect to a hospital where he "was forced to give a blood sample." *Young v. City of Irving*, 2024 WL 4193936, at *3. In Plaintiff's case — involving the same Officer Hammett — no field sobriety test, no breath test, no blood draw, and no medical screening was conducted,

despite ample time and opportunity. The absence of objective testing is not a training gap; it is a choice. When Irving officers believe intoxication is real, they gather evidence. When they do not, the reasonable inference is that the officers did not believe the statutory elements were satisfied.

**Markham's pattern: escalation without basis.** The VIN check illustrates the pattern. Before encountering Plaintiff, Markham was examining an unoccupied vehicle in a mostly empty parking lot. When Plaintiff later asked about it, Markham explained he "thought it might be stolen" and had compared the plate to the VIN. (Compl.    B). No report of a stolen vehicle, no reasonable suspicion, no objective indicator — just Markham's unsupported hunch, pursued to its fullest extent. The same pattern repeated with Plaintiff: no objective indicator of intoxication, no reasonable suspicion, no articulable basis — just Markham's unsupported conclusion, escalated from surveillance to confrontation to arrest. The basis for "I thought it might be stolen" is the same as the basis for "knew [Plaintiff] was about to jaywalk," "might have warrants," and the PI arrest itself: none. (Compl. ¶¶ B, J). At every stage of the encounter, Markham generated suspicion without basis and escalated without cause — then called it "proactive police work." (Compl.    J). The jaywalking attribution is particularly telling. The Supreme Court used jaywalking as its paradigm example of a rarely enforced offense weaponized to retaliate: "If an individual who has been vocally complaining about police conduct is arrested for jaywalking at such an intersection, it would seem insufficiently protective of First Amendment rights to dismiss the individual's retaliatory arrest claim." *Nieves v. Bartlett*, 587 U.S. 391, 401 (2019). Markham did not arrest Plaintiff for jaywalking — but he told Plaintiff he "knew [Plaintiff] was about to jaywalk" and that Plaintiff "might have

warrants" (Compl.    J), revealing that he was cataloguing potential pretexts before settling on PI. Markham's own label for this process — using rarely enforced offenses like jaywalking as pretexts to run IDs and check for warrants — is "proactive police work." (Compl.    J). The Supreme Court's label for the same conduct is a First Amendment violation. *Nieves*, 587 U.S. at 401. That Markham used the phrase without hesitation, in front of his FTO, with no concern it would be questioned, is itself Monell evidence: the conduct Markham described as standard practice is what the Constitution prohibits. When that label is read alongside his offer to "come up with" justification (Compl.    L), these statements, taken together, support a reasonable inference that what Markham was trained to call "proactive police work" is what the Fourth Amendment prohibits — arrests based not on "probable cause" but on the "mere whim [or] caprice" of the officer. *Beck v. Ohio*, 379 U.S. 89, 91 (1964). These allegations, taken as true, support a reasonable inference that Markham's conduct reflected a pattern rather than an isolated lapse.

**The pattern proves the training is inadequate.** Three officers, trained through the same TCOLE programs, committed the same category of violations: pretextual PI arrests unsupported by probable cause, retaliatory in motive, accompanied by excessive force, and followed by coercive jail practices. Hammett 27, Markham 15, Lewis 8. (Compl. at 22-23). When the training produces the same constitutional violation repeatedly, the training is inadequate — regardless of whether it meets TCOLE minimums. *See Canton*, 489 U.S. at 390.

**The FTO program transmitted the deficiency.** Hammett was Markham's Field Training Officer. (Compl. at 23). The FTO program is the City's primary mechanism for transmitting police practices to new officers. Hammett's conduct provides the pleaded "transmission mechanism" for the City's training and supervision failures. Plaintiff alleges that Hammett, the Field Training Officer, immediately echoed Markham's asserted basis for arrest without any independent assessment , applied force he then admitted was "completely unnecessary" (Compl.    U), and did not intervene while Markham conditioned release on deferential speech (Compl.    W). Markham admitted "100%" no basis for suspicion, offered to "come up with" justification, and arrested Plaintiff for continued criticism — all in front of his FTO. (Compl. ¶¶ L, O, R). Hammett did not correct any of this. Taken as true, these allegations support a reasonable inference that the challenged conduct was tolerated — if not reinforced — by the on-scene supervisor and training officer, and that the City's training and supervision were a moving force behind the violations alleged. These facts satisfy the deliberate indifference and causation elements of Plaintiff's Monell claim: the City's training officer was present, observed the conduct, and participated rather than corrected — establishing both that the deficiency existed and that it was the moving force behind the constitutional violations.

The Court should deny the City's Motion as to Argument D. The five specific training gaps, combined with the pattern of violations and the FTO transmission mechanism, adequately plead failure to train under *City of Canton v. Harris*. Accepting these allegations as true, as the Court must at this stage, the failure-to-train claim is plausibly stated.

## E. The Complaint States a Plausible Failure-to-Supervise Claim

The City labels Plaintiff's failure-to-supervise allegations "conclusory." They are not. The Complaint alleges specific operative facts establishing each element.

**Failure to supervise is a distinct Monell theory.** Training is about initial instruction. Supervision is about ongoing monitoring, discipline, and correction. The Fifth Circuit recognizes these as distinct theories. *See Burge v. St. Tammany Parish*, 336 F.3d at 370 (supervisory awareness plus failure to act equals liability); *Piotrowski v. City of Houston*, 237 F.3d at 578-79 (listing failure to supervise as separate Monell pathway).

**The FTO supervisory relationship.** Hammett was Markham's Field Training Officer — a direct supervisory relationship. (Compl. at 23). During the incident, Hammett supervised Markham's conduct and participated in it rather than correcting it. Hammett echoed Markham's pretext question within two seconds , applied force Hammett himself admitted was "completely unnecessary" (Compl. U), and then stood by while Markham presented a ride-or-jail ultimatum conditioned on attitude. (Compl. W). The City placed Hammett in a supervisory role. Taken as true, these allegations support a reasonable inference that the City's supervision was a moving force behind the violations alleged.

**The pattern was visible to the chain of command.** The Complaint alleges that City supervisors review and approve all arrests through mandatory procedures. (Compl. at 23). The clustering — Hammett 27, Markham 15, Lewis 8 — was visible through routine supervisory review of arrest reports, shift reports, and mandatory approval procedures.

(Compl. at 23). Despite this "clear clustering of arrests involving the same discretionary offense, the City took no corrective action." (Compl. at 23-24). Hammett's 27 PI arrests in approximately two years is roughly one every three to four weeks. Each generated a body-worn camera recording subject to supervisory review. Either supervisors reviewed those recordings and found nothing wrong with the pattern — or they did not review them at all. Both are failure to supervise. *See Burge v. St. Tammany Parish*, 336 F.3d 363, 370 (5th Cir. 2003) (single incident sufficient where failure to train is "obvious"). Here, Plaintiff alleges not one incident but 42 arrests by a two-officer subgroup — a pattern that was not merely visible but unavoidable to any supervisor performing routine review.

**body-worn camera muting went undisciplined.** The unexplained audio gaps (Compl. Y) occurred without discipline or corrective action. Supervisors who review body-worn camera footage would have observed the gaps. The failure to enforce body-worn camera documentation requirements — or even to inquire about audio gaps — is a specific failure of supervision.

**The suppression order triggered no response.** After the Irving Municipal Court suppressed all evidence and found the recording did not support the officers' claims (Compl. MM), the City took no corrective action. No investigation, no discipline, no policy changes. (Compl. at 26-27). A judicial officer determined that one of the City's officers arrested a citizen without probable cause. The supervisory chain took no action — no investigation, no discipline, no policy review. The City's supervisory apparatus received a judicial finding of a constitutional violation and treated it as unremarkable.

The full sequence of the City's response to being told its officer violated the Constitution: nothing — followed by filing a federal brief arguing the arrest was lawful. The City's failure to take any corrective action after a judicial finding that its officer lacked probable cause supports a plausible inference of deliberate indifference.

Each of these allegations identifies a specific actor, a specific act or omission, and a specific consequence. The City's "conclusory" label does not engage with any of them. The Court should deny the City's Motion as to Argument E. Accepting these allegations as true and drawing all reasonable inferences in Plaintiff's favor, as the Court must at this stage, the failure-to-supervise claim is plausibly stated.

## F. Exemplary Damages Are Conceded as to the City

Exemplary damages are unavailable against a municipality. *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981). The exemplary damages claim as to the City may be dismissed on that basis. Plaintiff's exemplary damages claims against the individual officer defendants are preserved.

# CONCLUSION

The Complaint alleges that the City of Irving has customs and practices that enable officers to use public intoxication arrests in retaliation for constitutionally protected activity. The minor classification of the charge discourages challenges, reducing feedback about constitutional violations. Plaintiff challenged the criminal charge, obtained a suppression order, and filed this § 1983 action.

The Complaint alleges specific statistical evidence of the pattern, a formal FTO training relationship that transmitted the practice, an informal "videotape guys" classification system known to both patrol and jail staff, seven hours of facially unconstitutional jail customs, and a municipal court suppression order that put the City on actual notice. These allegations, accepted as true, state a plausible Monell claim under every theory pled.

Plaintiff respectfully requests that the Court:

1. **Deny** the City's Motion to Dismiss in its entirety, with the exception of Argument F (exemplary damages against the City);
2. In the alternative, **grant leave to amend** under Fed. R. Civ. P. 15(a)(2); and
3. **Grant such other relief** as the Court deems just and proper.

Respectfully submitted,

Dale Lotts, *Pro Se*
401 E 8th St, Ste 214 PMB 7860
Sioux Falls, SD 57103
(612) 208-9601
dale.lotts@policeconduct.org

# CERTIFICATE OF SERVICE

I certify that on February 13, 2026, I served a true and correct copy of the foregoing Plaintiff's Response in Opposition to Defendant City of Irving's Rule 12(b)(6) Motion to Dismiss on all counsel of record via the Court's CM/ECF system:

Saul Pedregon, City Attorney Jason D. McClain, Assistant City Attorney City of Irving

825 W. Irving Blvd. Irving, Texas 75060

Dale Lotts, *Pro Se*
401 E 8th St, Ste 214 PMB 7860
Sioux Falls, SD 57103
(612) 208-9601
dale.lotts@policeconduct.org