**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| Dale Lotts, Plaintiff,<br>v.<br>James Markham; Andrew Hammett; Paul Lewis; City of Irving; Unknown Irving Jail Officer Believed to Be Bermudez; and Jail Officers Does 1, 2, 3, 5, 7, and 8, Defendants. | **Civil Action No. 3:25-CV-03329-S-BN** |

**PROPOSED FIRST AMENDED COMPLAINT**

## I. Nature of the action, jurisdiction, and parties

1. Dale Lotts brings this action under 42 U.S.C. § 1983 for his arrest, force used against him, continued detention, and punishment at the Irving jail on December 4, 2023. He seeks damages from the officers and jail employees responsible for their own conduct and from the City of Irving for the municipal practices alleged below.
2. This Court has federal-question and civil-rights jurisdiction under 28 U.S.C. §§ 1331 and 1343. Venue is proper under 28 U.S.C. § 1391(b)(2) because the challenged conduct occurred in Irving, Texas, within this District.
3. Plaintiff Dale Lotts is an individual proceeding without counsel.
4. Defendant James Markham, badge 1379, was an Irving police officer. He initiated the arrest, applied force, transported Lotts, communicated with jail staff, and authored Incident Report 23-28919. Lotts sues him in his individual capacity.
5. Defendant Andrew Hammett was an Irving police officer and Markham's former training officer. He joined the encounter before arrest, participated in the drinking exchange, and helped seize and restrain Lotts. Lotts sues him in his individual capacity.
6. Defendant Paul Lewis was an Irving police officer. He arrived after physical contact began and later escorted Lotts into the patrol vehicle. His challenged custody decision followed the conversation described below. Lotts sues him in his individual capacity.
7. Defendant Bermudez is the jail employee identified by that surname in the intake recording. The produced employee roster identifies Miguel Bermudez, employee C2191, as a candidate match. The match to the recorded person remains unconfirmed. Jail Officers Does 1, 2, 3, 5, 7, and 8 identify the employees by the distinct roles alleged below. Lotts sues each in an individual capacity.
8. Defendant City of Irving employed the police officers and operated the jail. The individual defendants exercised police or jail authority under color of state law during the challenged conduct. The City claim concerns its own policies, practices, and decisions described in Count Eight.

## II. Facts

### A. Lotts's walk and Markham's account of watching him

9. On December 4, 2023, Lotts had consumed no alcohol. He saw Markham looking into a vehicle in a parking lot. Lotts continued walking outside to other properties, including a hotel under construction, and returned about an hour later. He entered no business during that walk. On returning, he again saw the patrol vehicle near the one vehicle in the lot. He did not observe the patrol vehicle while away.

10. Lotts recalls about fifteen minutes between his return and approaching Markham. He walked about 130 feet away and 130 feet back, about 260 feet total, and sat and stood without difficulty. Markham later claimed to have watched him and accurately described his movements. Lotts approached to challenge what he regarded as unjustified continued surveillance. Lotts knows his own movements and Markham's statements; the start and extent of Markham's actual observations remain unknown.

11. The camera citations identify elapsed playback time on the named recording. The recordings have separate clocks. Markham's recording contains no usable audio for its first 29 seconds.

### B. Lotts criticized and recorded the officers; Markham allowed him to remain

12. Lotts held his phone and recorded the initial exchange with Markham while Markham was inside the patrol SUV. Lotts questioned Markham's parking. After Markham got out, Lotts again challenged the parking and asked whether Markham was above the law. Markham denied being above the law and asserted that emergency vehicles could park in no-parking areas. The initial exchange is captured by Lotts's cellphone recording, IMG_0079; the later discussion is also captured after Markham's BWC audio begins.

13. At Markham BWC 00:45–01:06, Lotts challenged the scope of that explanation: "It is, under certain circumstances, not all. So, for example, if you're shopping, you sure as hell don't get to go park there, right? It has to be official duty, official reasons, right?" He continued: "And right now, you don't have that." Markham answered: "I am performing my police duty here." Lotts said: "Really? You don't have to sit here to do that." Markham responded: "So, if I want to watch traffic, I can totally do that."

14. At 02:12–02:20, Markham said he knew Lotts was about to jaywalk, get a ticket, and have to identify himself. He added that Lotts might have warrants. At 02:22–02:26, Markham said: "And you saw me wait, so you went over there and you flipped me off, and you came back over here and you want to say something."

15. Lotts asked: "Well what are you sitting here, you know, waiting for me to jaywalk for? Like, you've got nothing better to do." Markham answered: "That's called proactive police work, my friend." He later said officers had received directives about jaywalking and pedestrians in the roadway.

16. Lotts's left hand entered his left shorts pocket at about 03:08 and came out by 03:13. Markham continued talking. He gave no audible command about Lotts's hands, pocket,

waistband, or a weapon during that movement. The camera did not show a retreat or weapon draw in response.

17. Lotts challenged Markham's justification for watching him. At about Markham BWC 03:25, Markham answered, "100%." At 03:26–03:38, Markham continued: "Would you like some justification? Because I can come up with it. You're coming from an area where people drink. You could be out in the roadway, and then you get PI. You might be drunk." He added that he could justify it "all damn day."
18. Lotts replied: "Yeah, I know, right? 'Oh, I smell alcohol and his eyes were watery,' right?" Markham answered, "Yep, I gotcha." Lotts was giving an example of a justification he distrusted. His quoted words were not an admission that he smelled of alcohol or had watery eyes.
19. Lotts continued criticizing the police. At 03:46–03:56, he said: "I don't fucking like cops, especially cops who think they can fucking sit around and intimidate citizens. I'm not intimidated in the slightest. Don't give a fuck. Get in your car and drive the fuck away."
20. Markham told Lotts, "So, you can leave," at about Markham BWC 04:07. He continued speaking with Lotts. At 04:38–04:46, Markham described the earlier vehicle investigation: "I found a tag that didn't match the VIN, so I was running it." He continued: "You know, basically, shit, I thought it might be stolen."
21. Hammett arrived at about Markham BWC 05:25. Markham again told Lotts, "You can leave," at about 05:33. At about 05:40–05:44, Markham said, "Okay, go ahead. You're free to go." Lotts replied, "I'm free to stay." Markham answered, "Yeah, you are."
22. Markham then said "back up" at about 05:47. Lotts answered, "I don't need to back up." Markham said, "Stay away from me," at about 05:50. Lotts answered, "Well, you can fucking leave." At about 05:55–06:00, Markham said, "Goodbye," Lotts said, "You're free to go, too," and Markham answered, "Yeah, I know. Do you have any other issues?"
23. Lotts accused the officers of profiling him. At 06:06–06:08, Hammett asked, "How do you think you're being profiled?" Lotts answered, "You just fucking got here." Hammett said, "I know." Lotts challenged Hammett for forming an opinion before investigating.
24. At Markham BWC 06:30, Markham first asked, "Have you been drinking tonight?" Lotts responded, "Have I? What do you think?" At 06:33–06:34, Hammett said, "Kind of seems like you have." Hammett stated no supporting observation in that exchange.
25. Before the arrest command, Markham had predicted that Lotts would cross the road. Markham also repeatedly allowed Lotts to leave and agreed that he could stay. Lotts remained beside the SUV, standing, responding to questions, criticizing police, and holding his phone. Markham had not asked him to perform a sobriety or coordination exercise or take a breath test. The first drinking inquiry was at 06:30. The arrest command was at 06:36, less than eight seconds later.

**C. The two commands, the hand movement, and the officers' first contact**

26. At Markham BWC 06:36–06:37, Markham said: "Go ahead and put your hands behind your back." Lotts answered at 06:38: "Yeah, fuck off." Lotts did not understand the first

command as a serious attempt to arrest him. He believed there was no probable cause and understood the command as another intimidation tactic. His response expressed that disbelief.

27. At Markham BWC 06:39–06:40, Markham repeated: “Go ahead and put your hands behind your back.” Lotts then understood that Markham was serious and moved his left hand behind his back to comply. While speaking, he raised the phone in his right hand. His left hand began moving behind his torso at about 06:40. Hammett’s camera shows that hand at Lotts’s lower back at about 02:03. The phone remained forward in his right hand.
28. After the second command began, Lotts asked: “Why? What’s your suspicion that I’ve been drinking?” The question appears at Markham BWC 06:40–06:43. Markham audibly sighed at about 06:43. He did not answer before extending his hand toward Lotts at about 06:44.
29. Markham made physical contact at about Markham BWC 06:45. Hammett approached from the other side and joined the restraint. Lotts was turned against the SUV as the officers moved his arms behind him. Contact began less than nine seconds after the first command and less than six seconds after the second. Markham BWC 06:36–06:47; Hammett BWC 02:00–02:11.
30. Lotts recalls Hammett forcefully shoving him from behind into the SUV. He identifies Hammett because Hammett was the only person behind him at that moment. This is Lotts’s present recollection. The available recordings show the approach, joint contact, and movement toward the SUV but do not isolate a separate shove. That recollection is subject to correction if additional recordings are produced or located.
31. Before contact, the phone remained visible in Lotts’s raised right hand. No strike or attempt to flee appears in that sequence. The cameras do not continuously show his feet. Markham and Hammett also moved toward him, so his increasing size in Markham’s image does not by itself establish a step toward an officer.
32. Markham maintained contact at Lotts’s arms and wrists while Hammett held and repositioned his hands behind his back. Their bodies and the SUV repeatedly blocked the cameras. By about Markham BWC 06:54–06:55, both hands were together near Lotts’s lower back. Lotts recalls being under their control from the initial grab and shove. He did not intentionally resist before, during, or after the arrest. He could not see which officer touched each wrist.
33. Lotts recalls pain mostly in his shoulders. It began almost immediately while his arms were forced behind him and continued until he could let them hang normally. He remained silent during that restraint. These pain and intent allegations are his present recollection. The recordings do not resolve the pressure, every obscured movement, or each wrist contact. Those details remain subject to correction if additional recordings are produced or located.
34. Lewis reached the contact area at about Markham BWC 07:01–07:03. He extended an open hand toward it and lowered that hand without visible contact in the inspected views. He later helped complete or check the cuffing. Lotts recalls Lewis using a second cuff set connected to the first. The recordings do not resolve every contact, and Lotts could not

identify each unseen hand at his wrists. The two-set account is his present recollection, subject to correction if additional recordings are produced or located.

35. Lewis's own produced recording begins after his arrival and the material initial cuffing interval. His arrival and the earlier cuffing history are shown or described through the other cameras and Lotts's recollection. Lewis's challenged direct custody acts occurred later, as alleged below.
36. Markham and Hammett continued securing the restraints through about Markham BWC 07:21. No audible resistance warning appears between the first command and the cuff check at about 07:35. At 07:19–07:22, Hammett said, "That was completely unnecessary." Lotts infers from the timing that the remark concerned the force. The recording does not identify its object.
37. Lotts's body size was visible to the officers. He reports Class 3 obesity dating from 2019. Photographs taken on December 5, 2023, show purple and reddish marks on his upper arm. Lotts attributes his shoulder pain and arm bruising to the seizure and restraint described above. He could not see each officer's hand during the obscured contacts.

**D. Markham offered release after questioning Lotts's attitude toward police**

38. After the search, Markham sat inside the SUV and handled identification and property. His recording lacks usable audio from about 09:31 through 12:33. During that interval, Hammett's recording captures the remark, "Couldn't stop talking before, now won't talk," at Hammett BWC 06:38–06:40. Lotts identifies Hammett as the speaker.
39. When Lotts questioned whether Markham's camera had been on, Markham answered at Markham BWC 12:43–12:44: "No, it was on. It was just on mute." The absent audio does not supply the words spoken during that interval.
40. Markham returned to Lotts, who remained handcuffed. Hammett and Lewis stood nearby. At 12:45–12:53, Markham said: "So, look, man, you've never been arrested before. You have no warrants out. Why do you hate the police so much?"
41. Markham then described a different approach Lotts could have taken: "Hey, man, you got me. It's cool. Can you just give me a ride across the street?" He said he could have directed Lotts to the crosswalk or given him a ride. This was Markham's hypothetical account of a more deferential exchange.
42. At 13:11–13:21, Markham said: "And even now, man, I can give you a ride back to your spot. Do you want to do that, or do you want to go to jail for public intox? It's up to you. It's up to you. I'm asking you what you want."
43. Lotts answered: "I'm already under arrest, so it's up to you." Markham then said that cuffs came off as easily as they went on. Lotts responded: "I don't mind the lawsuit either way." His first response acknowledged existing custody. It did not request jail.
44. The conversation is audible on Hammett's and Lewis's recordings as well as Markham's. Both officers were close enough for their microphones to capture it. Neither audibly corrected Markham or identified a reason Lotts had to remain jailed. Lotts infers from their proximity and participation that each heard the offer and his response.

45. Immediately after the ride-or-jail exchange, Markham said, “Let’s just take him.” Hammett BWC 08:52–08:53. Lewis then told Lotts, “Come on. Let’s go over here.” He held Lotts’s upper arm and escorted him to the patrol vehicle. Lewis BWC 05:24–05:30 records his direction and the start of the escort. The ensuing placement continued through the door closing at about 06:13. Lotts remained handcuffed.
46. During the later officer discussion, an officer Lotts identifies as Hammett said: “I noticed that he was staggering when he was walking too.” Markham BWC 13:26–14:43. The statement followed arrest and asserted an earlier observation. Lotts disputes that he staggered. The available precontact views do not provide a continuous walking sequence that resolves the assertion.
47. Markham’s recording also lacks usable audio at about 14:43–16:24. The video remains present. Lotts does not know the words exchanged in that absent-audio interval.

**E. Transport and three distinct communications with jail personnel**

48. Markham transported Lotts to the Irving jail. He stopped in the jail parking lot at about Markham BWC 24:59–26:24, about one minute and twenty-five seconds. He handled a clear property bag at about 25:10–25:35. After entering the sally port at about 36:35, he worked with another officer on loose vehicle trim. He separately handled property at a workstation at about 40:30–44:15. Lotts remained in the rear compartment until about 45:15.
49. At 42:37–42:45, Markham asked: “And then, would you like me to turn your phone off so you have some battery when you get out? I’m not going to touch it if you don’t want me to.” That statement followed the on-scene search and later property handling. It does not establish a search of the phone’s digital contents.
50. After Lotts left the vehicle, Markham called him a “videotape guy” and made a camera-like gesture to an unidentified employee or officer. Markham BWC 46:37–46:40 records this first handoff near intake. This recipient was distinct from the jailer in the later exchange. Lotts does not know the first recipient’s name or later communications.
51. At about 49:27–49:30, a jailer asked, “What’s wrong with him?” Markham answered: “He’s one of those videotape guys.” The confirmed words identify Markham’s description of Lotts’s recording activity. They do not establish that Lotts was a professional auditor or that every jail employee heard the statement.
52. Staff searched Lotts while he stood at the intake partition with his hands behind his head. Staff said they would ask medical questions. At 50:09–50:11, Lotts said, “I’m not answering the questions.” The search and intake directions continued.
53. Bermudez responded that failure to answer would result in a suicide smock. The audible portion at about 50:29 included: “if you don’t answer our [inaudible] questions,” followed by the suicide-smock consequence. At about 50:35–50:36, he said: “I don’t want to have to do it, these are just simple yes or no [inaudible] questions, okay.”
54. At about 50:49, the female jailer, Doe 2, asked Markham an inaudible question. Markham made a camera-like hand gesture and gave an inaudible response. She nodded, turned to

Lotts, and directed him to put his hands behind his back. The gesture resembled Markham's earlier gesture, but the unheard words cannot establish what she understood or later transmitted.

55. Lotts recalls that staff consulted another employee about his refusal to answer and the proposed restraint. Staff called that employee, identified here as Doe 1, into the exchange. The remembered substance was that they would have to restrain Lotts if he did not answer and wanted assistance. At Markham BWC 51:17–51:21, Doe 1 asked: "Sir, just one question: are you going to try to hurt yourself while you're here?" Lotts answered, "No." Doe 1 said, "Okay. He's good." Lotts found the preceding threat scary and disturbing. The consultation and Doe 1's ability to announce clearance support Lotts's inference that Doe 1 knew of the condition and had practical authority to resolve it. Lotts does not know his rank.
56. Markham's recording ended at about 52:10. The later jail events below are Lotts's recollection, with the separately identified telephone records. The recorded suicide-related exchange occupied approximately 53 seconds. That interval is not the duration of the later telephone, bedding, counsel, or hearing restrictions.

**F. Staff conditioned later access on answering and completing booking**

57. Staff placed Lotts alone in a cell. From that point, he lacked telephone access, sandals, a blanket, and a pillow. The cell was cold. He does not know the exact cell-placement time or temperature.
58. Over approximately five to six hours, multiple jail employees repeatedly told Lotts that he had to answer questions and complete processing to obtain access. They described the requirement as their policy, or words to that effect. Lotts understood the stated condition to apply to the telephone, access to a judge, and other access. These are the statements' remembered substance, not exact quotations.
59. The employee or employees responsible for denying telephone access are identified by the Doe 3 role. Lotts asked to contact a lawyer and recalls being refused access while he declined to answer. He did not speak with a lawyer before release. The exact identities and times of the separate requests remain unknown.
60. While Lotts remained locked in his cell, he saw other detainees processed and allowed calls. He recalls approximately 15–30 minutes when other detainees made calls and socialized outside their cells. His later receipt of ordinary items led him to recognize that he had been treated differently. He does not know their answers to intake questions or all their individual circumstances.
61. Lotts recalls asking, in substance, whether staff would hold him indefinitely without a telephone call or seeing the judge. He received no answer. He agreed to answer because the repeated staff statements convinced him he would otherwise remain detained indefinitely without telephone access or a hearing. He identifies those statements as the sole reason for changing his decision. He does not recall a separate later objection followed by an express

command to answer every question. The requirement to answer all the questions was implied in the condition staff communicated.

62. At an uncertain point during detention, staff offered food. Lotts refused it and said he was on a hunger strike until he received access to a lawyer. He alleges a voluntary refusal of offered food.

63. After Lotts answered questions and was fingerprinted, the female jailer who fingerprinted him asked whether he wanted sandals. He initially thought she meant the sandals he wore when arrested. He then understood that she was offering jail-supplied sandals. A different jailer handed him a pillow and blanket. At that point, Lotts recognized that those items had been withheld. He asked why he had not received them earlier and received a shrug. He had not known before answering that the items were being withheld. The offer and handover did not identify the employee who had made that earlier decision. Their exact times and order relative to the first call remain uncertain.

64. The first completed call to Lotts's significant other occurred shortly after he answered questions. The supplied call-history image displays December 4, 2023, at 06:23, lasting six minutes. Lotts recalls taking the screenshot in California and identifies the display as Pacific time, corresponding to 08:23 Central. His earlier message said 6:25. The image supplies the displayed minute.

65. About five hours and fifty-eight minutes elapsed between removal from the SUV for intake and that first completed call. Cell placement occurred later than removal from the SUV, at an unknown time. The calculation does not measure an exact telephone-denial period or establish when the bedding restriction ended. Lotts's current five-to-six-hour recollection replaces his earlier seven-hour-plus-one-hour estimates.

**G. Medical disclosures, sanitation, and the separate magistrate sequence**

66. During the later questions, Lotts disclosed atrial fibrillation, high blood pressure, and prescribed medications. Staff then checked his blood pressure. He recalls a systolic reading above 200, but not the exact number. He recalls no follow-up symptom questions, repeat measurement, medical evaluation, monitoring, or treatment before release.

67. Lotts did not then understand the significance of the reading. He interpreted staff's lack of concern as indicating a lack of danger. That was his understanding, not a medical assessment. He missed his prescribed morning medications, ordinarily taken at 8:00 a.m., including metoprolol. He told jail staff about his medications and recalls no offered way to obtain them.

68. Lotts also told jail staff that he had sleep apnea. He recalls no resulting action. Stress, cold, pain, and the absence of his CPAP impaired his sleep. He does not identify the particular recipients or exact times of those disclosures.

69. Lotts found brown residue in the cell toilet. He did not inspect it and does not know what it was. The toilet flushed, and he had water and part of a roll of toilet paper. He could urinate while standing but avoided defecating because of the residue.

70. Lotts asked the employee identified as Doe 5 to have the toilet cleaned so he could defecate. The employee told him to clean it himself. Lotts said he had nothing to clean it with. The employee directed him to use toilet paper and water. Lotts responded, in substance, that he was a person or human being. He does not recall his exact words. Lotts had asked for cleaning, rather than another cell. He recalls no alternative offered and experienced cramps, pain, and discomfort while postponing defecation during the cell stay.
71. Lotts heard other detainees participate in the morning magistrate process while he remained in his cell. Staff told him the judge wanted to speak with him individually. When he asked why, he recalls a reply in substance that it was none of his business. No jailer explained why he was excluded from the morning hearing or communicated an individualized safety concern explaining the delay. More broadly, no legitimate objective for the restrictions was communicated to him at any point. This is his account of what staff communicated. He infers punitive purpose from the stated answer condition, differential treatment, and sequence of events.
72. A magistrate physically came to Lotts's cell in the afternoon and conducted the same hearing process he had overheard that morning. Lotts tried to explain that he was not intoxicated and had been arrested in retaliation for his speech. She did not engage those subjects and confined the discussion to the hearing process. Lotts does not remember what she announced or decided and recalls no probable-cause discussion.
73. A second call to his significant other is displayed at 11:42 Pacific, corresponding to 13:42 Central, and lasted nine minutes. Lotts identifies it as his call reporting exclusion from the group hearing. That time does not establish when the exclusion or cell hearing occurred. He recalls release around 2:00 p.m. without bond or bail. His lack of recollection does not establish that no probable-cause determination occurred.
74. Lotts saw another detainee leave a cell without seeing anyone open the door or escort that detainee. When staff let Lotts out for booking and the second call, they told him over the intercom that he could open his own door. He did not observe the unlocking mechanism.
75. Lotts infers that his refusal to answer, the "videotape guy" classification, or both contributed to his treatment. Markham directed that classification to separate recipients. The officer believed to be Bermudez received the words immediately before the answer-or-smock condition. The female jailer received a separate camera-like gesture before directing Lotts's hands behind his back. Lotts infers that the classification was understood and carried into intake treatment from those handoffs, reactions, and resulting condition. The inaudible words are unknown. The later repeated answer condition and access after answers separately support his inference of a shared answer-before-access rule. He does not know which employee decided the morning-hearing arrangement or what that employee was told.

### H. The report, prosecution, and later records

76. Markham authored Incident Report 23-28919. Its narrative asserted slurred words, shuffled feet, unsteadiness while standing, and repeated loss of focus. Lotts disputes those impairment descriptions. He recalls walking, sitting, standing, and responding without the

reported difficulty. The recording shows his sustained exchange with Markham, repeated permission to leave, agreement that he could stay, and the later ride-or-jail offer. The report recounts permission to leave but omits the agreement that Lotts could stay and the later ride-or-jail exchange. Incident Report 23-28919, narrative at 2–3.

77. Markham later identified Hammett as his former training officer in suppression-hearing testimony. Markham testified that he had been released from training before this arrest. Suppression hearing 01:11:42–01:11:52. That prior instructional relationship preceded their joint participation in the encounter described above.

78. The sworn public-intoxication complaint in Irving Municipal Court cause JA063581-01 states that it was sworn and filed on December 4, 2023. It relied on information from the investigating officer's report. The later administrative approval cannot have preceded that expressly recorded filing date.

79. The report's administrative page records approval by employee 763 on December 5, 2023, at 15:28:07. A produced roster identifies employee 763 as Lewis Remington. Approval covers the original report, including its narrative. The record does not establish Remington's historical rank, the depth of review, whether he watched the BWC, or his policymaking authority.

80. On March 7, 2025, the Irving Municipal Court granted Lotts's motion to suppress. The order contains no findings identifying the suppressed evidence or deciding probable cause, intoxication, danger, credibility, or retaliation.

81. On March 19, 2025, the prosecutor moved to dismiss because the State believed it could not meet its evidentiary burden without the suppressed evidence. The court dismissed the charge. Lotts was not convicted.

82. At arrest, Lotts held a W-2 contract placement at Meta. It ended in April 2024. He reports about six months without work afterward and no steady work since, apart from one client relationship continuing through different companies since 2015. He must disclose the arrest when an application asks whether he has ever been arrested.

83. Lotts estimates an annual income reduction of about $200,000 and reports legal expenses and substantial financial stress. No employer, recruiter, or client told him that the arrest caused a rejection or lost engagement. He seeks only losses shown to have resulted from a defendant's constitutional violation.

## III. Claims for relief

### Count One. Fourth Amendment unlawful seizure

84. An arrest requires reasonably trustworthy information sufficient to warrant a prudent person in believing the suspect committed or was committing an offense. *Beck v. Ohio*, 379 U.S. 89, 91 (1964). Public intoxication requires intoxication in a public place to a degree that the person may endanger himself or another. Tex. Penal Code § 49.02(a); *Prim v. Stein*, 6 F.4th 584, 592–94 (5th Cir. 2021). Potential danger suffices, but the circumstances must support that element as well as intoxication. A reasonable mistake may support qualified immunity;

the offense facts must still be particularized to the person and known at seizure. *Club Retro, L.L.C. v. Hilton*, 568 F.3d 181, 204–07 (5th Cir. 2009).

85. Lotts identifies Markham's command at about Markham BWC 06:36 as the primary arrest boundary, consistent with the parties' positions. Alternatively, he submitted by moving his left hand behind his back at about 06:40. Officer-applied physical restraint began at about 06:45. Each officer's liability turns on the facts known at his own challenged act. A later event cannot supply missing probable cause at an earlier seizure. A later report's assertion of an earlier observation remains subject to the source and factual disputes alleged here.

86. Resisting arrest requires intentionally preventing or obstructing a known peace officer from effecting an arrest, search, or transportation by using force against the officer or another. Tex. Penal Code § 38.03(a). Later resistance cannot justify an earlier seizure. *Sauceda v. City of San Benito*, 78 F.4th 174, 187–88 (5th Cir. 2023). Interference requires criminally negligent interruption, disruption, impediment, or interference with an officer's duties; speech alone is a statutory defense. Tex. Penal Code § 38.15(a)(1), (d); *Freeman v. Gore*, 483 F.3d 404, 414–15 (5th Cir. 2007). Refusal to give identifying information under § 38.02(a) presupposes a lawful arrest. *Turner v. Driver*, 848 F.3d 678, 695 (5th Cir. 2017). Lotts alleges no force against an officer, physical interference, or refusal of identifying information during a lawful arrest before the challenged seizure.

**A. Markham — ordering and initiating the seizure**

87. Lotts sues Markham in his individual capacity and incorporates paragraphs 9–31 and 76–77. Before the 06:36 command, Markham had spoken with Lotts and described his earlier movements. He repeatedly allowed Lotts to leave and agreed that he could stay. Lotts remained standing beside the SUV with his phone visible. Markham described possible drinking and a possible future road crossing. He received no drinking admission and performed no sobriety exercise before ordering arrest, less than eight seconds after his first drinking inquiry. Paragraphs 76–77 supply the challenged report account for comparison; the later report and hearing do not add to Markham's arrest-time knowledge.

88. Markham's prediction of a future crossing, considered with Lotts's sustained conversation, standing posture, and permission to remain, did not establish intoxication creating danger. The reported slurring, shuffling, unsteadiness, and lost focus are disputed by Lotts's account of his own conduct. Removing those disputed descriptions and adding permission to stay and the responsive exchange leaves generalized suspicion of drinking and a predicted crossing. On the alleged facts, that corrected account supplies neither intoxication nor intoxication-related danger. The report's later words are tested as assertions of earlier observations, not accepted as established observations.

89. The result is the same at the alternative 06:40 submission and 06:45 contact points. Lotts moved his left hand behind him in compliance, kept his phone visible in his right hand, and asked why he was being arrested. Those intervening acts supplied no force against an officer or physical interruption of an identified duty. His profanity was speech. No lawful-

arrest identification refusal occurred before those seizure points. Markham personally caused the loss of liberty by ordering and enforcing custody.

90. The specific right was freedom from arrest where the initiating officer's known facts did not support the suspected offense or another offense. *Club Retro*, 568 F.3d at 204–07, denied immunity on allegations lacking particularized offense facts. *Turner v. Driver*, 848 F.3d 678, 693–95 (5th Cir. 2017), likewise rejected immunity for an arrest prolonged without an investigatory purpose when the pleaded facts supplied no threat, flight, aggressive action, or offense basis. Markham had spoken with Lotts and heard profanity, but neither that speech nor the visible phone supplied the missing offense elements. Unlike *Prim*, 6 F.4th at 593, the alleged facts did not include difficulty standing, failed sobriety testing, and a planned lengthy walk across intersections. The distinction is the missing factual basis, not a requirement to administer a particular test.

91. Taking Lotts's allegations as true, Markham violated the Fourth Amendment by causing an unsupported seizure, satisfying immunity prong one. The preexisting requirement of particularized offense facts gave Markham fair warning on the circumstances he personally encountered; the pleaded absence of such facts defeats arguable probable cause under prong two. Count One therefore states an unlawful-seizure claim against Markham. Lotts seeks compensatory damages for the resulting loss of liberty and attributable distress, nominal damages where appropriate, and punitive damages for the alleged knowing use of unsupported grounds.

**B. Hammett — joining the seizure**

92. Lotts sues Hammett in his individual capacity and incorporates paragraphs 21–31. Hammett arrived before the commands, heard the permission to leave and stay, questioned Lotts's profiling accusation, and supplied his own qualified drinking impression. He then approached and joined the restraint. Hammett's camera shows the left-hand movement behind Lotts's lower back before physical contact. His participation, rather than Markham's earlier surveillance, defines his relevant knowledge and act.

93. Hammett joined the physical restraint at about Markham BWC 06:45. Before joining, he heard permission to leave and stay, spoke with Lotts, saw the visible phone, and had a view of the left-hand compliance movement. His qualified drinking impression identified no impairment or danger fact. Taken together, those circumstances supplied no reasonable intoxication-and-danger basis for his physical seizure.

94. Hammett's later staggering assertion describes an earlier observation that Lotts disputes. Lotts's account supplies ordinary walking and no intentional resistance; the camera's incomplete walking views do not resolve the dispute. Replacing the asserted staggering with that account leaves responsive speech, standing beside the SUV, a visible phone, and compliance with the repeated command. None supplies intentional force against an officer, physical interference, or refusal of identification during a lawful arrest. Hammett personally added physical restraint and loss of liberty. Later cuffing, reports, and prosecution cannot justify his earlier joinder.

95. *Club Retro*, 568 F.3d at 204–07, required particularized arrest facts and rejected reliance on generalized suspicion. Hammett had a shorter observation period than Markham, but he supplied the drinking impression himself and joined with no communicated fact completing the danger element. *Babb v. Dorman*, 33 F.3d 472, 479–80 (5th Cir. 1994), involved driving after five beers, a 0.08 alcohol reading, and responsibility for a severely intoxicated passenger. Those affirmative danger circumstances differ from the facts alleged to have confronted Hammett. The right at issue is not freedom from arrest whenever a suspect disputes an officer; it is freedom from a joining officer's physical seizure without an objectively supportable offense basis.

96. Hammett's alleged participation in an unsupported seizure violates the Fourth Amendment under prong one. The absence of particularized intoxication-and-danger facts or a supported alternative offense also defeats an objectively reasonable probable-cause mistake under prong two. Count One states a claim against Hammett for his own joinder. Lotts seeks compensatory damages for Hammett's contribution to lost liberty and attributable distress, nominal damages where appropriate, and punitive damages for the alleged knowing participation.

**C. Lewis — continuing custody through escort and vehicle placement**

97. Lotts sues Lewis in his individual capacity and incorporates paragraphs 34–35, 40–45. Lewis arrived after the initial contact. His own recording captured Markham's no-warrant statement, explanation contrasting deferential speech, offer of a ride instead of jail, and statement that the cuffs could come off. Lotts answered that the choice belonged to Markham. Lewis then directed Lotts to move, held his arm, and placed him in the patrol vehicle. Lotts infers Lewis heard the exchange from the recording, proximity, and immediate action; he does not impute Markham's earlier knowledge to Lewis.

98. Before Lewis's escort, Markham told the handcuffed Lotts that he had no warrants and that a ride remained available "even now." He contrasted the speech that could produce a ride with Lotts's treatment and said the cuffs could come off. Lotts left the choice to Markham. Markham then said, "Let's just take him," and Lewis imposed the additional restraint.

99. Lewis's own communicated information concerned a restrained man who could be released immediately and had not selected jail. The exchange identified no intoxication-related danger, new offense, force, physical interference, or lawful-arrest identification refusal. On those facts, Lewis's command and escort continued custody without an objectively supported offense basis. The relevant knowledge is what Lewis heard and observed before his act, not Markham's uncommunicated earlier observations.

100. The right asserted against Lewis is freedom from affirmative continuation of an unsupported seizure on the facts personally communicated to the later-arriving officer. *Turner*, 848 F.3d at 693–97, distinguished the officers who imposed the unsupported arrest from Driver, who investigated promptly and secured release. Lewis instead enforced continued custody after the release discussion. *White v. Pauly*, 580 U.S. 73, 79–80 (2017), concerned a later-arriving officer in an armed confrontation and cautioned against imputing

earlier officers' knowledge. This claim observes that boundary: the alleged warning information came from Markham in Lewis's presence before Lewis acted, while Lotts was restrained and no new threatening act was identified.

101. On the alleged knowledge and circumstances at Lewis's own act, the continued seizure violated the Fourth Amendment under prong one. Lotts contends that *Turner*'s distinction between unsupported continuation and prompt investigation/release gave Lewis fair warning, and that the pleaded information defeats an objectively reasonable basis under prong two. Count One states a direct-participation claim against Lewis. Relief is limited to compensatory damages for his added restraint and attributable distress, nominal damages where appropriate, and punitive damages for the alleged knowing continuation; it does not charge him with initiating the arrest.

**Count Two. First Amendment retaliation**

102. Retaliation requires constitutionally protected activity, an injury that would chill a person of ordinary firmness, and adverse action substantially motivated by the protected activity. *Keenan v. Tejeda*, 290 F.3d 252, 258–61 (5th Cir. 2002). Recording police and verbally opposing their conduct are protected within lawful limits. *Turner*, 848 F.3d at 688–90; *City of Houston v. Hill*, 482 U.S. 451, 461–63 (1987). A retaliatory-arrest plaintiff ordinarily must establish absence of probable cause and that the arrest would not have occurred without the retaliatory motive. *Nieves v. Bartlett*, 587 U.S. 391, 398–407 (2019). Lotts's primary route rests on the absence of probable cause and the speech-linked facts alleged for each officer. The ride comparison is Markham's own account of how different speech would have changed his response.

**A. Markham — arrest in response to criticism and recording**

103. Lotts sues Markham in his individual capacity and incorporates paragraphs 12–30 and 38–45. Markham heard the criticism and saw the recording. He said he could "come up with" justification, allowed Lotts to leave or stay, and ordered arrest within seconds of the drinking inquiry. Afterward, Markham asked why Lotts hated police and described how deferential speech could have produced a ride. He offered release "even now," then chose continued custody after Lotts left the decision to him. The later words support the motive inference for the earlier arrest and directly explain the challenged later custody choice.

104. The criticism and recording were protected activity. Markham's command, physical seizure, and continued custody caused loss of liberty sufficient to deter ordinary expression. His own justification statement and comparison between deferential speech and jail support the inference that the criticism substantially motivated those acts. Lotts alleges that Markham would not have arrested him or continued custody without that motive. Paragraphs 87–89 apply the absence of probable cause at arrest. At the later decision, Markham himself offered immediate release and chose jail after Lotts declined to request it. His acts caused the retaliatory loss of liberty.

105. *Enlow v. Tishomingo County*, 962 F.2d 501, 509–10 (5th Cir. 1992), denied immunity on disputed facts supporting arrest in response to photography and questioning, with probable cause disputed. Markham similarly heard questions and criticism while being recorded and allegedly responded with an unsupported arrest. Enlow arose at summary judgment and did not finally find retaliation; this complaint pleads the comparable sequence and Markham's additional direct speech-focused statements. Together with *Hill*'s protection of verbal opposition, that precedent gave fair warning against using arrest to punish this speech.

106. Accepting those facts and the grounded motive inference, Markham violated the First Amendment under prong one. The pre-event photography-and-questioning comparison gave him fair warning under prong two; the pleaded absence of probable cause prevents that defense from disposing of the claim. Count Two states a retaliation claim against Markham. Lotts seeks compensatory damages for lost liberty and attributable distress, nominal damages where appropriate, and punitive damages for the alleged purposeful punishment of protected expression.

**B. Hammett — joining an arrest in response to criticism**

107. Lotts sues Hammett in his individual capacity and incorporates paragraphs 21–30, 38–44, and 76–77. Hammett challenged Lotts's profiling accusation and heard criticism of his immediate judgment without investigation. He then supplied the drinking impression and helped seize Lotts. After restraint, Hammett contrasted Lotts's earlier speech with his silence: "Couldn't stop talking before, now won't talk." He remained beside Markham during the speech-focused release discussion. Those later words and acts supply motive evidence; they are not earlier knowledge.

108. Lotts's criticism of Hammett was protected verbal opposition. Hammett's physical seizure caused loss of liberty and an injury that would deter ordinary expression. His own exchange, immediate drinking assertion and seizure, later speech-to-silence remark, and presence during the speech-linked custody choice support the inference of retaliatory motive. Lotts alleges that his criticism substantially motivated Hammett's participation and that Hammett would not otherwise have joined. The offense-element application in paragraphs 92–94 supplies the alleged absence of probable cause.

109. *Enlow*, 962 F.2d at 509–10, supplied the pre-event comparison for arrest allegedly prompted by photography and questioning when probable cause remained disputed. Hammett's observation period was shorter, but the expression was directed to him, he supplied an asserted basis for custody, and he immediately helped implement it. Those personally known facts distinguish mere presence at another officer's arrest. *Hill*, 482 U.S. at 461–63, protected verbal opposition; it did not authorize physical obstruction, which the alleged precontact facts do not show. The comparison gave Hammett fair warning against arresting in response to this criticism without a supported offense basis.

110. Hammett's alleged speech-motivated participation satisfies the First Amendment violation under prong one. His direct receipt of the criticism and the preexisting photography-and-questioning precedent defeat immunity under prong two on the pleaded facts. Count Two

states a retaliation claim against Hammett. Lotts seeks compensatory damages for Hammett's contribution to the retaliatory loss of liberty and distress, nominal damages where appropriate, and punitive damages for the alleged purposeful participation.

**C. Lewis — implementing the later speech-conditioned custody choice**

111. Lotts sues Lewis in his individual capacity and incorporates paragraphs 40–45. Lewis's recording captured Markham asking why Lotts hated police, contrasting a deferential request with Lotts's treatment, and offering a ride or jail. Lotts left the decision to Markham and mentioned a lawsuit. Lewis then gave his own direction and physically escorted Lotts into the vehicle. His proximity, recorded audio, and immediate act support the inference that he heard and understood the choice before enforcing it.

112. Lewis's command and escort continued a deprivation of liberty that would deter ordinary expression. The communicated contrast between deferential speech and jail, followed by his enforcement of jail after Lotts's response, supports the inference that protected speech substantially motivated Lewis's own act and that it would not have occurred without that motive. His relevant probable-cause application is paragraphs 97–99; the claim does not rely on knowledge of the earlier encounter. The alleged injury is the additional restraint Lewis imposed, not every earlier act by Markham or Hammett.

113. In *Enlow v. Tishomingo County*, Officer Wall physically arrested Enlow after the sheriff responded to Enlow's questions and photography with an arrest command. 962 F.2d 501, 503–04 & n.7, 509–10 (5th Cir. 1992). The court upheld denial of Wall's qualified-immunity motion on the disputed speech-and-probable-cause facts. Lewis likewise implemented a custody choice after hearing its speech-linked explanation. Wall applied the initial cuffs; Lewis commanded and escorted a person already cuffed. In each comparison, the participant's own act enforced the communicated speech-linked custody decision. The asserted right concerns that knowing participation, not an earlier motive Lewis did not hear.

114. On the alleged hearing, knowledge, and causal sequence, Lewis's own act violated the First Amendment under prong one. Lotts contends the preexisting prohibition on speech-retaliatory arrest applied to the custody choice Lewis knowingly implemented and supplied fair warning under prong two. Count Two states a direct retaliation claim against Lewis. Lotts seeks compensatory damages for the additional loss of liberty and distress, nominal damages where appropriate, and punitive damages for the alleged purposeful continuation.

**Count Three. Fourth Amendment excessive force**

115. A Fourth Amendment excessive-force claim requires an injury resulting directly and only from clearly excessive force whose excessiveness was clearly unreasonable. *Trammell v. Fruge*, 868 F.3d 332, 340 (5th Cir. 2017). Reasonableness turns on the circumstances confronting the officer, including offense severity, immediate threat, active resistance, and attempted flight. *Graham v. Connor*, 490 U.S. 386, 396–97 (1989). Each application below addresses the preceding commands and compliance, the initial force, the continued restraint, and the resulting injury.

**A. Markham — contact and continued arm restraint**

116. Lotts sues Markham in his individual capacity and incorporates paragraphs 16–37. Markham allowed Lotts to stay, gave two commands, and saw a phone in his right hand while the left moved behind his back. Markham initiated contact at about 06:45, less than nine seconds after the first command. He maintained restraint as Lotts was turned against the SUV and his arms were held behind him. Lotts alleges control from the initial contact and no intentional resistance. His visible body size and the preceding compliance sequence informed the need and amount of force.

117. The suspected misdemeanor, absence of a strike or flight, visible phone, and left-hand compliance limited the need for force. Lotts's profanity and question did not supply physical resistance. Markham maintained the raised-arm restraint after both hands were together behind Lotts. Lotts experienced immediate shoulder pain until his arms could hang normally and later observed arm bruising. He alleges that Markham's injurious force exceeded what was reasonably needed to secure his compliant, controlled body. The obscured contacts do not alter his firsthand pain and no-resistance account.

118. *Hanks v. Rogers*, 853 F.3d 738, 744–49 (5th Cir. 2017), held that abrupt injurious escalation against a minor-offense suspect without a threat or flight risk violated clearly established law. Hanks had empty hands behind his back and the officer used a half-spear takedown. Lotts held a visible phone, moved his left hand behind him, and was restrained against an SUV. His claim concerns the same need to match force to actual threat, resistance, and compliance before and during escalation. Lotts alleges that he did not intentionally resist. His account gives Markham less resistance than the at-most-passive resistance described in *Hanks*.

119. On the alleged control, compliance, force, and injury, Markham violated the Fourth Amendment under qualified-immunity prong one. *Hanks* gave fair warning against abrupt injurious escalation despite the absence of threat or flight and the demonstrated compliance. The continued raised-arm restraint also must be assessed against Lotts's controlled position. Those allegations defeat prong two at pleading. Count Three states a claim against Markham for his own force. Lotts seeks compensatory damages for physical injury and distress, nominal damages where appropriate, and punitive damages for the alleged knowing use of unnecessary force.

**B. Hammett — joint force and continued restraint**

120. Lotts sues Hammett in his individual capacity and incorporates paragraphs 21–37. Hammett saw the left hand move behind Lotts while the right held a visible phone. Hammett approached, joined contact at about Markham BWC 06:45, and held and repositioned Lotts's hands behind him. Lotts recalls Hammett's distinct shove from behind into the SUV. Hammett continued arm restraint and cuffing while Lotts was controlled. His own approach, shove, and continued arm control define this claim.

121. From Hammett's own view, the suspected misdemeanor, left-hand compliance, visible phone, and absence of flight or intentional resistance limited the need for force. Lotts alleges that the shove and continued arm leverage caused or contributed to immediate shoulder pain and upper-arm bruising. The pain continued until his arms could hang normally. He attributes the shove to Hammett from his position behind Lotts; he does not assign each unseen wrist contact from that position alone. His recollection and the camera limits are stated in paragraphs 29–37.

122. *Trammell v. Fruge*, 868 F.3d 332, 340–43 (5th Cir. 2017), denied immunity for injurious joint force against a nonfleeing, nonaggressive public-intoxication suspect. The officers tackled Trammell after he pulled his arm away. Lotts alleges a shove into an SUV and continued painful arm control while complying, without an intentional pull away. The different surface and the longer interval before contact do not supply threat, flight, or resistance on his alleged facts. Hammett's own view and continuing hold required him to match the force to the controlled posture. The claim identifies injurious joint participation, distinct from the uninjurious arm grab separately addressed in *Trammell*, id. at 343.

123. Hammett's alleged injurious force beyond the degree reasonably needed satisfies prong one. The distinction in *Trammell* between ordinary uninjurious control and disproportionate injurious participation supplies the asserted fair warning under prong two. Count Three states a claim against Hammett for his causal contribution. Lotts seeks compensatory damages for attributable physical injury and distress, nominal damages where appropriate, and punitive damages for the alleged knowing continuation of unnecessary force.

**Count Four. Section 1983 conspiracy to violate the First and Fourth Amendments**

124. A Section 1983 conspiracy requires an agreement to commit an illegal act and an actual deprivation of constitutional rights. *Cinel v. Connick*, 15 F.3d 1338, 1343 (5th Cir. 1994). Facts must support the agreement. *Terwilliger v. Reyna*, 4 F.4th 270, 285 (5th Cir. 2021). Lotts alleges that Markham and Hammett agreed to the unsupported arrest, retaliation, and excessive force pleaded against them. Their prior training relationship and their separate acts supply the alleged basis.

**A. Markham — directing and implementing the alleged agreement**

125. Lotts sues Markham in his individual capacity and incorporates paragraphs 21–47 and 76–77. Hammett had trained Markham before this encounter. At the scene, Hammett supported the drinking premise immediately before Markham gave the commands and initiated contact. Both officers then seized and restrained Lotts. Hammett later contrasted Lotts's speech with his silence. Markham described the speech that could obtain a ride and continued custody after Lotts's response. Lotts infers a shared retaliatory course from their prior instructional relationship and these complementary acts.

126. Markham implemented the inferred agreement through his arrest command, physical seizure, continued restraint, and speech-linked custody choice. His knowledge came from his own encounter and Hammett's immediate participation. The prior training relationship

supports the inference of a shared understanding manifested by those acts. The later statements corroborate that inference without supplying words for the absent audio. The agreed acts caused the unlawful seizure, retaliation, and force injuries applied to Markham in paragraphs 87–91, 103–106, and 116–119.

127. The agreed acts implicated the same conduct-specific rules stated in those counts. *Club Retro*, 568 F.3d at 204–07, required particularized offense facts for arrest. *Enlow*, 962 F.2d at 503–04, 509–10, addressed participation in an arrest following a speech-linked command. *Hanks*, 853 F.3d at 744–49, addressed injurious escalation against a minor-offense suspect without threat or flight. Markham personally supplied the command, encountered the speech, and used the force. The alleged agreement concerns those acts with that knowledge and those injuries.

128. Taking the supported agreement inference and underlying allegations as true, Markham's implementation caused First and Fourth Amendment deprivations under prong one. The conduct-specific precedent comparisons provide the asserted fair warning for his participation under prong two. Count Four states a conspiracy claim against Markham for injuries caused by the agreed acts. Lotts seeks compensatory damages for those attributable injuries, nominal damages where appropriate, and punitive damages for the alleged purposeful agreement and implementation.

**B. Hammett — supplying and implementing the alleged shared basis**

129. Lotts sues Hammett in his individual capacity and incorporates paragraphs 21–47 and 76–77. As Markham's former trainer, Hammett had a prior instructional relationship with him. Hammett personally challenged Lotts's accusation, supplied the immediate drinking impression, and joined the resulting seizure and restraint. His later speech-to-silence remark and continued presence during Markham's speech-focused custody choice supply further context. Lotts infers that Hammett knowingly adopted and implemented the shared course from that relationship and his own affirmative conduct.

130. Hammett's drinking assertion, shove, and joint restraint implemented the inferred agreement. His alleged acts produced the unsupported joinder, retaliation, and force applied in paragraphs 92–96, 107–110, and 120–123. His prior instructional relationship supports the agreement inference but does not impute Markham's earlier observations to him. His own conversation, view of compliance, physical participation, and later speech remark connect him to the alleged object and resulting lost liberty and injury.

131. Hammett's fair warning follows the particular acts he knowingly helped implement. *Club Retro*, 568 F.3d at 204–07, required particularized arrest facts. *Enlow*, 962 F.2d at 503–04, 509–10, addressed an officer's implementation of a speech-linked arrest command. *Trammell*, 868 F.3d at 340–43, addressed injurious joint force against a nonaggressive public-intoxication suspect. Hammett's own conversation, view of compliance, shove, and continued restraint supply the factual comparisons explained above. His alleged agreement implemented those same constitutional deprivations.

132. On the pleaded agreement and implementation, Hammett caused the identified constitutional deprivations under prong one. The particularized pre-event arrest, retaliation, and force comparisons supply the asserted fair warning under prong two. Count Four states a conspiracy claim against Hammett. Lotts seeks compensatory damages for his causal contribution to lost liberty and physical injury, nominal damages where appropriate, and punitive damages for the alleged purposeful participation.

133. The officers invoke the intracorporate-conspiracy doctrine. *Hilliard v. Ferguson*, 30 F.3d 649, 653 (5th Cir. 1994), addressed a school board and its employees under § 1985(3). Lotts asserts a Section 1983 agreement to punish his criticism through unsupported custody and force. His inference rests on the established instructional relationship and the complementary speech, arrest, force, and custody acts alleged for each officer. He contends that the doctrine does not foreclose that claim.

**Count Six. Fourteenth Amendment punitive booking restrictions**

134. A pretrial detainee may not be punished. A restriction constitutes punishment if imposed with that intent or if it lacks a reasonable relationship to a legitimate nonpunitive objective, or is excessive in relation to that objective. *Bell v. Wolfish*, 441 U.S. 520, 535, 538–39 (1979). Challenges to a general condition, practice, or rule follow that framework; an episodic act or omission requires subjective knowledge of a substantial risk of serious harm and deliberate indifference under *Hare v. City of Corinth*, 74 F.3d 633, 644–50 (5th Cir. 1996) (en banc). Lotts identifies below the rule or individual act each employee allegedly implemented, the knowledge supporting the purpose inference, and that employee's attributable injury.

135. *Collins v. Ainsworth*, 382 F.3d 529, 540 (5th Cir. 2004), recognized the clearly established prohibition on punitive conditions unrelated to a legitimate objective. It nevertheless rejected the short telephone and mattress restrictions at issue there. Id. at 545–46. *Hamilton v. Lyons*, 74 F.3d 99, 106–07 (5th Cir. 1996), alternatively rejected listed three-day restrictions even assuming punitive intent. Lotts therefore relies on the particular coercive use, deprivation, effects, and knowledge alleged for each employee, not purpose or duration alone. *Hope v. Pelzer*, 536 U.S. 730, 739–46 (2002), supplies the method for assessing obvious fair warning without materially identical facts; it is not a factual analogue for this intake.

**A. Officer believed to be Bermudez — the recorded suicide-smock condition**

136. Lotts sues the officer believed to be Bermudez in his individual capacity and incorporates paragraphs 51–55 and 75. Markham called him out, he asked what was wrong with Lotts, and Markham called Lotts "one of those videotape guys." Bermudez then tied refusal to answer questions to a suicide smock. Lotts alleges that Bermudez carried the recording-related classification into the answer condition and its propagation through intake into the resulting restrictions. That propagation is inferred from his direct receipt, question, and

ensuing conduct. When Doe 1 asked directly about self-harm, Lotts denied it and Doe 1 announced clearance.

137. Bermudez knew both the classification he had just received and the nonanswering trigger he stated. The timing and content support Lotts's inference that he used the threatened restriction to compel answers and punish noncooperation. The threat frightened and disturbed Lotts. Under Bell, that purposeful condition and its implementation constitute the alleged punishment. If Hare governs his individual act, Lotts relies on Bermudez's announcement and implementation of the threatened restraint to support the knowledge-and-disregard inference. The alleged risk arises from that threatened restraint and its coercive use. His liability extends to the effects caused by that conduct, including any continuation of the condition through his participation proved from the handoffs. Lotts infers that Bermudez's classification and condition contributed to the later answer-before-access treatment from the handoffs and continuing use of the answer requirement. Doe 1's clearance ended the stated self-harm concern, while the later access conditions continued. Each later restriction retains its separate actor and timeline.

138. The specific right is freedom from deliberate use of a suicide-related restriction to punish refusal to answer, without an individualized safety basis. Bell and Collins supplied the pre-event prohibition on punitive restrictions unrelated to a legitimate objective. The threatened smock was not shown to have been applied. The claim rests on Bermudez's coercive condition, its frightening effect, and the inferred propagation of the classification into that treatment. Lotts invokes Hope's obvious-clarity method because the stated trigger was refusal to answer. Hope involved prolonged physical punishment. Lotts applies its fair-warning method to Bermudez's alleged purposeful use of this condition and its actual effects.

139. Bermudez's alleged punitive condition and implementation violated due process under prong one. Lotts contends that Bell and Collins applied with obvious clarity to that deliberate use and defeat immunity under prong two. Count Six seeks nominal damages, compensatory damages for the resulting fear and other attributable injury, and punitive damages for the alleged purposeful conduct. The approximately 53-second recorded suicide-related exchange does not measure the duration of the separate later restrictions.

### B. Doe 1 — participation in the immediate intake condition

140. Lotts sues Doe 1 in an individual capacity and incorporates paragraphs 53–55. Staff consulted Doe 1 about Lotts's refusal and the proposed restraint, then brought him into the exchange. Doe 1 obtained the immediate self-harm answer and announced clearance. Lotts infers that Doe 1 knew of the outstanding condition from the consultation and his resulting participation. His apparent ability to resolve it supports an inference of practical decisional authority. His formal rank remains unknown.

141. Lotts alleges that Doe 1 knowingly participated in the outstanding answer-or-restraint condition by obtaining the answer in response to staff's consultation. The condition frightened and disturbed Lotts. Doe 1 then said, “Okay. He's good,” ending the stated self-

harm concern. Lotts attributes to Doe 1 his participation in that coercive exchange and its effects. The consultation, rather than presence alone, supports the pleaded knowledge and participation. Under Bell, knowing implementation of that punitive condition supplies the violation. Under Hare's episodic-act alternative, Lotts relies on the consultation about restraint and Doe 1's adoption of the condition. Those facts supply his basis for inferring knowledge and disregard of the risk associated with the threatened restraint.

142. The specific right is freedom from knowing participation in a punitive answer-or-restraint condition unrelated to an individualized nonpunitive need. Bell and Collins supplied that pre-event prohibition. Doe 1 was brought into the announced condition to help resolve the refusal, and he obtained an answer while it remained outstanding. Lotts contends that this deliberate participation had an obvious punitive character under Hope's fair-warning method. His later clearance ended the stated concern. The claim addresses the preceding knowing participation and resulting fear.

143. Accepting the alleged knowledge and participation inference, Doe 1's contribution to the immediate coercive deprivation satisfies prong one; Lotts contends the preexisting punishment rule applied with obvious clarity to that knowing participation under prong two. Count Six retains the claim against Doe 1 on that basis. Requested relief is nominal damages and any compensatory or punitive damages supported by Doe 1's own conduct and attributable injury. The claim rests on the consultation and pre-clearance participation alleged above.

**C. Doe 2 — recorded participation in the intake restraint**

144. Lotts sues Doe 2 in an individual capacity and incorporates paragraphs 52–55. During the recorded intake exchange, Doe 2 asked Markham an inaudible question. He made a camera-like gesture and gave an inaudible response; she nodded and directed Lotts's hands behind his back. Her recorded presence and affirmative restraint direction support the alleged participation. The unknown words do not establish a specific instruction or later transmission.

145. Lotts infers that Doe 2 knowingly implemented the ongoing punitive answer condition through her own restraint direction. The inferential basis is her participation during the announced condition and immediate coordinated conduct, not an assumption that every jail employee heard Markham's earlier label. The constitutional question is the purpose and knowledge accompanying her own direction. Her knowing use of restraint to implement that alleged condition contributed to the immediate deprivation under Bell. Under Hare's episodic-act alternative, Lotts relies on her presence during the announced restraint condition and her affirmative direction as the knowledge-and-disregard premises.

146. Bell and Collins clearly prohibited punitive restrictions unrelated to a legitimate governmental objective before this encounter. The asserted specific warning is against deliberately employing intake restraint to enforce that condition. Unlike Collins's short telephone and mattress restrictions, Doe 2's alleged act was an affirmative restraint direction in the immediate coercive exchange; unlike Hope, the record does not establish

prolonged physical punishment. Lotts relies on the obviousness of knowing punitive implementation, not a categorical ban on hand-position instructions. The unknown conversation remains a factual limit and is not supplied as a quoted admission of her purpose.

147. On the alleged knowledge and punitive-participation inference, Doe 2's own direction contributed to a due-process deprivation under prong one. Lotts contends the established punishment prohibition gave obvious fair warning for that deliberate implementation under prong two. Count Six retains the claim against Doe 2. He seeks nominal damages and compensatory or punitive damages only as supported by her personal conduct and its effects; no later communication or restriction is attributed to her through the inaudible exchange alone.

**D. Doe 3 — enforcing the telephone condition**

148. Lotts sues the employee or employees identified by the Doe 3 role in their individual capacities and incorporates paragraphs 57–65. Lotts repeatedly requested telephone and lawyer access and was told he had to answer questions and complete processing first. He observed other detainees using an available telephone. After approximately five to six hours of repeated condition statements, he answered because he believed access and release from isolation would otherwise remain unavailable. The first completed call followed answers. He had no lawyer contact before release. Each actual employee must be identified by the particular refusal he or she communicated or enforced.

149. The employee who stated and enforced the condition knew both the request and the answer requirement being applied. The repeated express condition, functioning phone, comparator access, and compliance-linked change support the inference that the denial was used to compel answers rather than caused by unavailable facilities. That employee's refusals caused the period of isolation and inability to obtain assistance attributable to those refusals, and contributed to Lotts's decision to comply. The challenge is to that punitive rule under Bell. To the extent a refusal is treated as an individual act, the alleged express use of the denial to obtain compliance supplies the asserted knowledge and deliberate action.

150. Collins, 382 F.3d at 540, recognized the established punishment prohibition and rejected an overnight telephone restriction on its summary-judgment record. Id. at 545–46. Hamilton involved a detained parolee who alleged that transfer was withheld until he gave a statement. It rejected the listed three-day conditions even assuming punitive intent. 74 F.3d at 106–07. Its separate statement-coercion claim was barred because it implicated outstanding convictions. Id. at 102–03. Lotts was not convicted. He alleges repeated refusals of an available telephone, isolation, and an answer condition that caused his decision to comply. *Waganfeald v. Gusman*, 674 F.3d 475, 484–86 (5th Cir. 2012), involved telephone failure and Hurricane Katrina conditions. Here, staff permitted other detainees to use the functioning telephone. Lotts contends that Bell and Collins gave fair warning against the deliberate punitive use alleged, applying Hope's obvious-clarity method to each employee's conduct and the resulting deprivation.

151. Accepting the alleged punitive rule, knowledge, attributable deprivation, and coercive effect, the responsible Doe 3 employee violated due process under prong one. Lotts contends the pre-event punishment rule gave fair warning for the particular deliberate use under prong two. Count Six states the telephone-condition claim against each employee shown to have enforced it. Relief is compensatory damages for attributable isolation and distress, nominal damages where appropriate, and punitive damages for the alleged purposeful conduct.

**E. Doe 7 — withholding ordinary items**

152. Lotts sues the employee or employees responsible for withholding ordinary items, identified by the Doe 7 role, in their individual capacities. He incorporates paragraphs 57, 60, 61, 63, and 65. He remained cold without sandals, a blanket, or a pillow. After answers and fingerprinting, the female fingerprinting jailer offered sandals and a different employee handed him a pillow and blanket. Only then did he recognize the differential treatment. His question about the earlier absence received a shrug. The withholding decisionmaker and exact withholding duration remain unknown.

153. Lotts infers an item-withholding condition from the absence of ordinary items and their provision after answers and processing, considered with the repeatedly stated access rule. He learned of the withholding afterward, so he does not attribute his earlier decision to answer to a conscious desire to obtain those items. He alleges knowing implementation by the employee responsible for the withholding decision or its continuation. The withholding caused cold and impaired sleep until the items arrived. The first call is a separate endpoint. Under Bell, the punitive rule and implementation supply the alleged violation. An individual-act analysis rests on the responsible employee's own knowledge of a substantial risk of serious harm and deliberate disregard of that risk.

154. Collins rejected the overnight mattress claim before it, and Hamilton rejected the listed three-day restrictions even assuming punitive intent. Collins, 382 F.3d at 545–46; Hamilton, 74 F.3d at 106–07. Lotts alleges a deliberate item-withholding decision operating with the answer condition, with cold, impaired sleep, and distribution following answers. Bell and Collins supplied the established prohibition on punitive restrictions unrelated to a legitimate objective. Under Hope's method, Lotts contends that this prohibition gave fair warning against using the alleged condition to inflict those deprivations. The item claim rests on the responsible employee's knowing withholding and its effects, not the later provider's identity alone.

155. On the alleged knowing enforcement and attributable cold and sleep deprivation, the responsible Doe 7 employee violated due process under prong one. Lotts contends the established prohibition gave fair warning against the pleaded deliberate use under prong two. Count Six retains the ordinary-items claim against the employee responsible for the withholding decision or its knowing implementation. Requested relief is compensatory damages for attributable discomfort and distress, nominal damages where appropriate, and punitive damages for supported purposeful conduct.

**F. Doe 8 — the separate individual-magistration restriction**

156. Lotts sues the employee identified by the Doe 8 role in an individual capacity and incorporates paragraphs 71–75. Other detainees attended a group process while Lotts remained confined. Staff said the judge wanted to speak with him individually, and responded to his request for a reason, in substance, that it was none of his business. A magistrate later visited his cell. Lotts's inference of punishment rests on the differing treatment and the earlier recording-related classification; the record does not establish that every participant in the later arrangement knew the earlier label.

157. Doe 8's challenged act is knowing implementation of the punitive exclusion and associated delay. Staff's statement that the judge wanted an individual visit described the arrangement but supplied no reason for the exclusion. The response to Lotts's request for a reason reinforced his inference of punishment. He alleges that Doe 8 made or knowingly enforced that exclusion and thereby caused the additional confinement attributable to it. Bell permits a punitive-purpose inference from an arbitrary restriction. The claim depends on Doe 8's own decision or knowing implementation.

158. Bell and Collins prohibit punishment unrelated to a legitimate governmental objective. *County of Riverside v. McLaughlin,* 500 U.S. 44, 56–57 (1991), separately recognizes that even a probable-cause determination within 48 hours can be unreasonably delayed through ill will or delay for its own sake. Riverside does not require personal attendance at every group session, and the remembered afternoon visit does not establish when probable cause was determined. Lotts contends that these pre-event decisions gave fair warning against Doe 8's knowing imposition of punitive exclusion or delay. The claimed violation is the purpose and effect of that employee's own restriction.

159. Accepting the alleged knowing-punishment inference and its causal connection to Doe 8's act, the restriction violated due process under prong one. Lotts contends the pre-event punishment rule gave fair warning for that deliberate act under prong two. Count Six retains this separate individual-magistration claim against Doe 8. He seeks compensatory damages for attributable additional deprivation and distress, nominal damages where appropriate, and punitive damages for supported purposeful punishment. This claim does not expand the municipal answer-condition path or attribute a magistrate's decision to an employee without a source.

**Count Seven. Fourteenth Amendment sanitation deprivation — Doe 5**

160. Lotts sues Doe 5 in an individual capacity. A pretrial detainee's punishment claim is governed by Bell's prohibition on conditions unrelated or excessive in relation to a legitimate objective. 441 U.S. at 535, 538–39. For a discrete employee response, Hare requires subjective knowledge and deliberate disregard of a substantial risk of serious harm. 74 F.3d at 644–50. This count concerns the employee's response to Lotts's stated toileting need, not an inferred citywide sanitation policy.

161. Lotts incorporates paragraphs 69–70. He reported the toilet condition, asked for cleaning so he could defecate, and explained that he had nothing to clean it with. Doe 5 told him to use toilet paper and water himself. The toilet flushed, water and part of a toilet-paper roll were available, and the brown residue's identity was unknown. Lotts could urinate standing but avoided defecating and experienced cramps, pain, and discomfort. The precise exchange time and ensuing duration attributable to Doe 5 remain uncertain.

162. The direct request gave Doe 5 notice that the condition was preventing Lotts from using the toilet for defecation. Lotts alleges that the instruction to clean it himself, after he explained his inability, knowingly left that basic need unmet and caused the ensuing pain and discomfort. The alleged disregard is inferred from the communicated need and specific response; it is not an assertion that Doe 5 knew the residue was a particular biological substance. The available water, paper, and flushing bear on whether the response adequately addressed the need. Lotts contends it did not and that the deliberate refusal was punitive rather than an adequate sanitary alternative.

163. The asserted specific right is freedom from a knowing deprivation of usable toilet access after communicating the need to defecate, with resulting pain. *Taylor v. Riojas*, 592 U.S. 7, 8–9 & n.2 (2020), applied obvious-clarity reasoning to extreme six-day feces and sewage conditions and distinguished shorter dirty-cell confinement with cleaning supplies. This case is shorter, the residue is unidentified, and some supplies existed. Lotts therefore does not treat Taylor as a direct factual match. He invokes Bell's established punishment prohibition, Collins's recognition of that rule, and Hope's method for the alleged deliberate denial of a basic need despite direct notice. The claim's fair-warning argument depends on the actual deprivation and inadequacy of the stated response, not on describing every dirty toilet as unconstitutional.

164. Accepting the alleged knowing refusal, inadequate response, and resulting painful deprivation, Doe 5 violated due process under prong one. Lotts contends that the established prohibition applied with obvious clarity to that deliberate denial and defeats immunity under prong two. Count Seven states the retained sanitation claim against Doe 5. Lotts seeks compensatory damages for attributable cramps, pain, discomfort, and distress, nominal damages where appropriate, and punitive damages for supported purposeful disregard.

**Count Eight. Municipal liability: City of Irving**

165. Lotts alleges municipal liability against the City of Irving for the constitutional injuries identified in the four paths below. Municipal liability requires an official policy, municipal attribution, and a constitutional violation caused by that policy. *Peña v. City of Rio Grande City*, 879 F.3d 613, 621 (5th Cir. 2018).

166. Irving Code § 29-4(c) assigns departmental policy issuance to the Police Chief. Section 29-4(d) assigns the Chief responsibility for managing the City jail. Section 29-4(b) places the Chief under City Manager supervision and Council disciplinary oversight. Section 29-6(b) requires covered personnel to follow departmental directives.

167. Irving's July 2019 "General Orders" assign training-needs analysis and departmental training to the Personnel and Training Section. That section reports through a lieutenant to the Administrative Services Bureau Chief. The orders also provide for supervisory review of charge legality and reports, complaint tracking, investigation, counseling, training, and discipline. Section 303.07 requires a Response to Resistance Report for force greater than soft empty-hand control or force resulting in injury or a claim of injury. It also assigns supervisors responsibility for ensuring required reports are completed and the related body-camera recordings are properly tagged and categorized.
168. Markham testified that Hammett had been his training officer. Markham's TCOLE record lists 720 hours in the "Basic Peace Officer Course" completed November 8, 2022. It lists 160 hours of Irving field training completed May 6, 2023.
169. Irving's public-release report for incident 23-6594 records a PI arrest on March 18, 2023. It identifies Markham as the reporting officer and lists Hammett among the other officers. That shared assignment preceded Markham's field-training completion.
170. Irving's February-August 2023 appraisal describes Hammett as a training officer, an informal shift leader, and a resource for other officers. The appraisal states, "He is committed and takes this duty seriously." It describes his continuing development of his instructional method.
171. A separate 2023 commendation record identifies reviews by Lieutenant Philip Howard, Deputy Chief Kirk Lecroy, and Assistant Chief Thomas Hover. Its next routing field names Chief Derick Miller. A final entry states that Sergeant John Phillips forwarded the incident into IAPro.
172. In a July 7, 2023 email, Sergeant John Phillips reported an investigation and review of Young's complaint about his arrest. Phillips classified it as "Unfounded" and closed it. Young reproduced that correspondence in his later federal complaint, which alleges Hammett's participation in the arrest. The email identifies the arrest report but does not name Hammett or specify the allegations investigated. It documents a pre-arrest complaint-review process. The later pleading's allegations remain Young's attributed account.
173. These records identify Irving's training, supervision, and complaint-review functions before Lotts's arrest. Lotts alleges that those functions transmitted and maintained the practices described below. The specific municipal inferences rest on each path's identified conduct, review records, and injuries.

### A. M-01: Arrest and reporting practice

174. Lotts incorporates paragraphs 14 through 25, 40 through 45, and 76 through 83. Markham described departmental directives and predicted a ticket and identification sequence that could lead to a warrant. Markham permitted Lotts to leave more than once, agreed that Lotts could remain, and supplied a conditional PI justification. Hammett gave a drinking impression and joined the arrest.

175. Markham later offered release or a ride while discussing Lotts's attitude and how Lotts could have approached him. Hammett and Lewis were nearby. Neither audibly corrected the offer. Lotts infers from their proximity and the recorded exchange that they heard it.
176. Markham's report describes Lotts's gestures, recording, and questions, and alleges impairment. It recounts permission to leave more than once and predicts that Lotts would cross the street after Markham left. The produced narrative does not recount permission to remain, the later ride offer, or its speech context. The fourth page is Nicole Barrier's separate December 6, 2023 supplement recording digital-media processing for in-car and body-worn cameras. It supplies no account of the officers' force or correction of Markham's narrative. The four-page production contains no Hammett or Lewis narrative.
177. The sworn complaint identifies Markham's report as its basis and states that it was sworn and filed on December 4, 2023. The original report received administrative approval on December 5. The charge remained pending for about fifteen months. After suppression, the prosecutor sought dismissal because the State could not meet its evidentiary burden without the suppressed evidence. The court dismissed the charge without a conviction.
178. Lotts alleges an existing practice of making PI arrests without objective support for a required offense element and carrying those arrests through reporting and prosecution. The practice permitted intoxication or danger conclusions without connecting them to the circumstances known when the officers acted. Speech-focused enforcement and investigative fallback were ways officers applied that practice.
179. Lotts infers municipal maintenance from Markham's stated directives, the trainer-trainee relationship, joint implementation, and the report's passage through charging and review. The pre-arrest training and review records identify the City functions through which officers learned and maintained their methods. Lotts alleges on information and belief that the City's authorized policymakers knowingly maintained this practice through those functions.
180. The City controls the corresponding departmental instructions, training evaluations, review criteria, and approval records. Lotts's information-and-belief allegation concerns municipal authorization and maintenance of the practice inferred from the facts above.
181. The practice caused Markham and Hammett to arrest Lotts without the element support described in Count One. It caused the resulting seizure, restraint, and loss of liberty. Its speech-focused application also caused the First Amendment injury alleged in Count Two.
182. The report-to-charge process prolonged Lotts's need to defend the PI charge and caused the prosecution expenses identified in his damages allegations. The December 5 approval corroborates the alleged existing review practice. That approval's causal role concerns later maintenance and use of the account. Lotts seeks compensatory and nominal damages for the constitutional injuries caused by the City's practice.

**B. M-02: Training and field-training transmission**

183. A failure to train supports municipal liability when it amounts to deliberate indifference and the identified deficiency causes the constitutional injury. *City of Canton v. Harris*, 489 U.S.

378, 388-391 (1989). A pattern of similar violations ordinarily supplies notice of the specific deficiency. *Connick v. Thompson*, 563 U.S. 51, 61-63 (2011).

184. Lotts incorporates the training relationship, course records, shared March 2023 incident, and instructional appraisal stated in paragraphs 168 through 170. Hammett's course record also lists Irving field-training-officer instruction and updates, and a 40-hour instructor course completed in February 2023. These records identify the City's instructional relationship and delivery process.

185. The identified deficiency concerns teaching and reinforcing objective PI-element assessment and speech-neutral arrest and release decisions. The course records include arrest, search, seizure, impaired-driving, and report-writing instruction. Lotts alleges that Irving's field-training process did not carry the required element assessment into the officers' decision practice.

186. Markham and his former trainer implemented the same progression from a drinking impression to arrest. They remained involved when Markham offered release while discussing Lotts's attitude. Lotts infers that the instructional relationship transmitted or reinforced the method they applied during his arrest.

187. Lotts alleges deliberate indifference through the City's knowing maintenance of this decision practice. His information-and-belief basis includes the training relationship, Hammett's reviewed instructional role, joint implementation, and the earlier Professional Standards complaint and response. Those facts support his inference that the deficiency persisted through the City's training and corrective functions.

188. Irving controls its lesson plans, field-training evaluations, instructional reviews, and corrective referrals. Lotts's allegation concerns the City's training and maintenance of the identified decision practice.

189. The training deficiency caused the officers to use a drinking impression and speech-focused judgment in place of the required element assessment. That method produced the arrest and continued restraint alleged in Counts One and Two. Lotts seeks compensatory and nominal damages for the loss of liberty and associated injury caused by that municipal training failure.

### C. M-03: Post-arrest report approval and maintenance

190. A failure to supervise requires a supervisory failure, a causal connection to the constitutional violation, and deliberate indifference. *Peña*, 879 F.3d at 623. Lotts challenges Irving's review practice that accepted arrest accounts without requiring the missing connection between the facts and the asserted grounds for custody.

191. Lotts incorporates paragraphs 76 through 83 and 167, 171, and 172. The report records approval by employee 763, identified in the produced roster as Lewis Remington, on December 5, 2023. The approval covers Markham's original narrative.

192. The approved report recounts permission to leave more than once and then predicts danger after Markham's departure. It does not identify a change explaining why the report changed from permission to leave to arrest. The narrative also omits the agreement that Lotts could

remain and the later offer of release. The produced package contains no corrective narrative from Hammett or Lewis.

193. Lotts infers that the approval reflects an existing review process that accepted those grounds for custody without an explanation. The 2019 review rules, 2023 routing, and earlier complaint review identify the City's channels for detecting and correcting that deficiency. Lotts alleges on information and belief that authorized municipal officials knowingly maintained that process with deliberate indifference to arrests lacking objective element support.

194. The report-visible omissions support the inference about what review accepted. The recording supplies the separate permission-to-remain and release-offer facts. Lotts alleges that reviewers accepted the account without requiring an explanation supporting continued use. The City controls review assignments, recording-access records, corrective records, and report transmissions.

195. The alleged existing review practice permitted arrest decisions lacking objective element support to pass without explanation or correction. Lotts infers that this practice reinforced the arrest method applied to him and caused the associated unlawful seizure. The later approval corroborates that earlier practice. From the report-based charge and its continuation, Lotts also infers that maintenance and use of the account sustained his prosecution and defense expenses.

196. Lotts seeks compensatory and nominal damages for the constitutional injuries caused by this municipal supervisory failure. The December 4 charging act and December 5 approval remain separate events with separate causal roles.

**D. M-10: The jail's answer-before-access rule**

197. Lotts incorporates paragraphs 50 through 65. Bermudez tied the suicide-smock consequence to answering questions. Lotts then answered the direct self-harm question, and Doe 1 said, "Okay. He's good." Staff later continued to condition telephone access on answers and described the requirement as their policy.

198. For about five to six hours, multiple employees stated the answer-and-processing condition more than once. Staff refused Lotts's telephone and lawyer requests while he declined to answer. Other detainees received processing and calls. No employee communicated another individualized objective for Lotts's telephone restriction after the self-harm denial.

199. Lotts answered because he believed staff would hold him "indefinitely without phone access or hearing" until he answered. He attributes that belief to their statements. His first completed call followed his answers. About six hours separated intake from that call.

200. Lotts separately remained in a cold cell without a pillow, blanket, or jail sandals. After he answered, a female jailer fingerprinted him and offered jail sandals. A different jailer then handed him a pillow and blanket. Lotts recognized the earlier withholding when that handover occurred and asked why he had not received the items earlier. The jailer shrugged.

201. Lotts did not know before answering that staff were withholding those items. He does not recall an express statement making the items conditional on answers. Their delivery time and order compared with the first call remain uncertain. He infers their connection to the answer rule from the processing and delivery sequence.
202. Employees described the policy across five to six hours and coordinated its use across jail functions. Lotts infers that staff applied an authorized municipal operating rule. He alleges on information and belief that the rule made answers and processing prerequisites for telephone access and ordinary items. The telephone condition rests on remembered staff statements. The item condition rests on the separate sequence described above.
203. The Code's policy-issuance and jail-management assignments identify the municipal route for this rule. Lotts alleges authorized operation through the Chief's assigned functions within the City's governing structure. The City controls the rule's source, versions, approvals, and staff instructions. The inference rests on the descriptions and implementation across five to six hours, together with those assigned municipal functions. *Groden v. City of Dallas*, 826 F.3d 280, 284-286 (5th Cir. 2016).
204. The rule caused staff to delay telephone access until Lotts answered and completed processing. It prolonged his isolation and caused the anxiety and compelled compliance alleged in Count Six. The separate item restriction caused cold, discomfort, and impaired sleep while he lacked those items. Lotts alleges punitive restrictions on a pretrial detainee under Count Six's Fourteenth Amendment standard.
205. This municipal path concerns telephone access and ordinary items. Lotts seeks compensatory and nominal damages for the constitutional injuries caused by those restrictions.
206. Accepting these facts as true and drawing reasonable inferences in Lotts's favor, Lotts states a municipal-liability claim against Irving through each identified path.

**IV. Unidentified employees and requested identification**

207. The Doe designations identify the employees by their alleged roles, acts, location, and detention period. The intake recording, booking assignments, intercom communications, telephone records, and property records provide concrete means to identify them. Lotts requests discovery of those identifying records, leave to substitute the supported names, and a reasonable period for service under Rule 4(m). The same person may have performed more than one described role. Each employee's liability remains tied to that employee's conduct, knowledge, and causal contribution.
208. Lotts obtained access to the relevant video through the September 26, 2025 production and reviewed intake before filing his complaint. He recalls that ordinary viewing did not disclose the surname. Frame-by-frame enlargement around January 14–15, 2026 revealed the surname he read as Bermudez. He first used it in his February 12 responses. The produced roster supplies a candidate match, not confirmation. He asks the Court to permit identification and substitution on that chronology.

209. Rule 15(c)(1)(C) addresses notice of this lawsuit within the Rule 4(m) period and the reason the intended defendant was not named. *Jacobsen v. Osborne*, 133 F.3d 315, 320–21 (5th Cir. 1998), and *Balle v. Nueces County*, 952 F.3d 552, 556–58 (5th Cir. 2017), distinguish a mistake from inability to identify a Doe defendant. Balle denied relation back where the plaintiff lacked knowledge of the defendants' identities. Lotts seeks a separate determination concerning the recorded person later identified by a candidate surname and each employee still identified by role. Lotts requests a defendant-specific determination after identification and production of the relevant notice and role records. He seeks to establish whether each intended defendant received timely lawsuit notice through the actual communications and shared representation, and whether the naming circumstances satisfy Rule 15(c). Knowledge of the detention event is distinct from notice of this lawsuit. The requested discovery and service period allow those questions to be addressed on the responsible employee's facts.

**V. Prayer for relief and jury demand**

210. Lotts requests judgment against each defendant for the injuries caused by that defendant's constitutional violations, including:

A. Compensatory damages for the proved loss of liberty, physical injury and discomfort, emotional distress, and causally supported economic loss.

B. Nominal damages for a proved constitutional violation where compensatory damages are not established.

C. Punitive damages against an individual defendant whose proved conduct warrants them.

D. Taxable costs, any attorney's fees recoverable under 42 U.S.C. § 1988, lawful interest, and other relief supported by the judgment.

211. Lotts demands a jury trial on all issues triable to a jury.

Respectfully submitted,

/s/ Dale Lotts

Dale Lotts, Plaintiff, Pro Se
401 E. 8th St., Ste. 214 PMB 7860
Sioux Falls, SD 57103
(612) 208-9601
dale.lotts@policeconduct.org